In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2946

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

MARIO GRACIA,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Illinois.
No. 98 CR 40125--G. Patrick Murphy, Chief Judge.

ARGUED May 17, 2001--DECIDED November 19, 2001


  Before HARLINGTON WOOD, JR., KANNE, and
ROVNER, Circuit Judges.

  HARLINGTON WOOD, JR., Circuit Judge.
Mario Gracia ("Gracia") appeals his jury
conviction and sentencing on counts of
conspiracy to commit bank fraud under 18
U.S.C. secs. 371 & 1344, bank fraud
under 18 U.S.C. sec. 1344, wire fraud
under 18 U.S.C. sec. 1343, and conspiracy
to commit money laundering under 18
U.S.C. sec. 1956(h). We have jurisdiction
under 28 U.S.C. sec. 1291, and we affirm
both the conviction and sentence.


I.  BACKGROUND

  Because most of Gracia's arguments are
challenges to the factual findings and
sufficiency of the evidence, the facts,
as set forth in the trial transcript, are
presented in detail. In 1995, a group of
approximately fifteen inmates
incarcerated at the federal penitentiary
in Greenville, Illinois devised and
implemented an extensive check kiting
scheme. The scheme was masterminded by
prisoner Ernie Hill and included Jesus
Bonillas. Unable to conduct the bank
transactions themselves, Hill and the
inmates recruited numerous friends and
relatives outside of the prison. Hill
sent blank business checks to his half-
brother Michael Ochoa, who then filled

out the checks which were usually drawn on the account of a closed or fictitious mortgage company. The checks, most written for tens of thousands of dollars, were then sent directly to various banks for deposit into the personal bank accounts of individuals designated by Hill or other co-conspirators.

Most of the personal bank accounts were ones that had not been recently opened and were in good standing. The account holders were carefully instructed when to withdraw funds. Hill or a co-conspirator would wait until the worthless check was deposited, then allow a certain amount of time for the check to be posted. A posted check makes the funds available in the account but has not yet been honored (or, in this case, always declined) by the bank on which it was drawn. The account holder was instructed to withdraw money during this crucial period before the check bounced. The money was then split between Hill, Ochoa, and other participants. The success of the scheme greatly depended on precision timing, which necessitated three-way calls to co ordinate the withdrawals. Gracia's brief states that losses to the banks totaled approximately $430,000.

Bonillas, who was married to Gracia's sister (who was also involved in the scheme), recruited Gracia. Gracia contacted his brother Frank ("Frank")/1 about participating. Both Gracia and Frank resided in Tucson, Arizona. Frank was instructed by Gracia to come to Gracia's home in order to take a telephone call from Bonillas, who offered to place a certain amount of money in Frank's bank account to be disbursed to other parties as directed by Bonillas, with Frank keeping a certain percentage. Although Bonillas told Frank the money to be deposited was money owed to himself and other inmates, Frank testified that he believed almost from the start that this was a fraudulent scheme and was convinced it was fraud by the time he participated in the first transaction. Two checks were eventually deposited in Frank's account, one for $20,300 and one for $15,000. Frank was told by Bonillas to withdraw $18,000 and to purchase two cashier's checks for $5,000 made payable to Luisa Cardenas. At that same time, Bonillas agreed that Frank could take $3,000 of the money to purchase a

cashier's check made payable to Frank's mortgage company. Bonillas also instructed Frank to give $3,000 to Gracia.

Frank sent the check to his mortgage company but two days later the mortgage company called to tell him the bank would not honor the check. When this occurred, Frank went to complain to his brother. Gracia placed a call to Bonillas from his home. Frank spoke with Bonillas and threatened to go to the authorities about the scheme if Bonillas did not give him $3,000. Bonillas then asked to speak to Gracia, who had remained in the room during the call. After speaking to Bonillas, Gracia left the room, returned, and handed Frank $3,000 in cash. Several days after a second fraudulent deposit had been made in Frank's account, the bank closed his account.

The two cashier's checks for $5,000 were sent to Luisa Cardenas./2 Cardenas met Hill sometime in 1989-90, when Hill and her brother were incarcerated in the federal prison in San Pedro, California. Shortly after, she began "doing favors" for Hill by setting up three-way phone calls and receiving money from Western Union wire transfers. Sometime in 1993-94, she also began writing fraudulent checks for Hill.

Cardenas received the two $5,000 checks sent by Frank, but testified that she refused to cash them because her name would then become part of the paper trail and that it would be too dangerous and she might get caught. Gracia flew to Los Angeles to meet Cardenas. At the airport, Cardenas had a telephone conversation with Hill, confirming that Gracia had arrived to pick up the two checks. Cardenas testified that Gracia questioned her about how the operation worked. She told him that Hill arranged for money to be deposited into an account, then Hill would tell him to withdraw a certain amount and Gracia would get to keep half of the total withdrawal. Gracia asked if "anybody [had] gotten caught, anybody gotten in trouble." She told him that as far as she knew, "no one had gotten in trouble or caught."

Upon his return to Tucson, Gracia attempted unsuccessfully to cash the two cashier's checks. He went to a branch

bank where a relative-by-marriage worked as a service manager. This relative testified that she refused to cash the two checks because they were not made out to Gracia nor were they endorsed over to him. The original uncashed checks were submitted as evidence at trial.

In August of 1995, Gracia also went to his nephew Phillip Mota and asked Mota to send money to someone not known to Mota. Gracia drove Mota to Western Union and gave Mota approximately $5,000, with $200 to pay for the wiring fees. While Gracia waited in the car, Mota was instructed to send a $5,000 wire transfer to a Maria Rolon./3 Gracia gave Mota $75 for his help. Rolon, who had been recruited by Hill, testified that she received several checks like the one from Mota, totaling approximately $60,000. She stated that she kept about $10,000 out of that total and forwarded the rest to various names as instructed by Hill.

Also in August, Miguel Jimenez, an inmate at the Fairview Heights, Illinois state prison, contacted his niece, Angie Jimenez Badilla ("Angie"), in Tucson and told her he was sending someone to take her to open a bank account in her name. Angie was fifteen at the time and did not drive. Although she was married, she and her husband Daniel lived with Angie's mother. On August 17, 1995, Gracia, a complete stranger to Angie, picked her up along with her mother, drove them to a branch bank in Green Valley, Arizona, and gave Angie $150 in cash, telling her to open an account while he waited in the car. On August 21, two fraudulent mortgage checks, one for $40,000 and one for $29,000, were deposited in Angie's account. Although both checks were endorsed with the name Angie Jimenez, Angie testified that she had never endorsed the checks.

Several days later, Gracia called Angie and told her to take out as much money as she could from her bank account. Gracia met Angie outside the bank and questioned her when she came out. Angie said that the teller told her she could withdraw $11,000, but as she was filling out the paperwork, she was informed that the account had been frozen. After telling Gracia what happened, she returned home. She was contacted by Gracia a day or two later. He called her, then arrived at her

house, giving her a cashier's check made out to Enedino Egurrola,/4 Bonillas' aunt, for $7,324.67. Gracia drove her to a bank in Tucson and told her to cash the check while he waited in the car. She re turned with $7,324.67 in cash, which Gracia took. He gave her $50 for her cooperation. Another day or so later, Gracia called Angie again and came to her house. He drove both her and her husband to Western Union. He gave Angie $3,000 plus the fee for the wire transfer, and told her to send it to Delores Rolon (Maria Rolon's sister), someone unknown to Angie.

Gracia also used Angie's husband Daniel for several transactions. On the first occasion, Gracia came to the home of Angie's mother, where Angie and Daniel were living. Daniel had never met Gracia. Gracia asked Daniel to cash a $5,000 cashier's check for him, which he then filled out with Daniel's name. Gracia drove Daniel to the bank and waited outside for Daniel to cash the check. Gracia then took Daniel to Western Union, giving Daniel the $5,000 plus $200 for the wiring fee, and instructed him to send a wire transfer to Cardenas. The next day Gracia returned to Daniel's home, gave Daniel $4,000 plus approximately $200 for the transfer fee, took him to Western Union and instructed him to wire the money to a Norma Santos./5 Gracia paid Daniel $50 each time for his assistance. Gracia contacted Daniel one last time to tell Daniel that he was going to put some money in Daniel's credit union account, explaining to Daniel that it was money from some of Gracia's friends in jail who were owed money. Gracia drove Daniel to the bank after the checks had been deposited, but when Daniel tried to make a withdrawal, credit union officials informed him that his account had been frozen.

Bonillas sent a fraudulent check for $22,000 to be deposited in the account of his elderly aunt, Egurrola, who also did not speak English. Gracia supervised the disbursement of the money. Egurrola testified (through an interpreter) that although Gracia did not accompany her to the bank, he called her one morning to inform her that the money had been deposited in her account, instructed her that she had to go and make the withdrawal immediately, told her how much

to take out, who to send it to, and in what form. She stated that Garcia emphasized she was not to use his name in any way. He then sent someone to her home that same afternoon to pick up the checks. Four days later the bank called Egurrola and asked her to return the money because the deposited check had been identified as stolen. She contacted Gracia and told him they had to return the money. He told her that was not possible. Two or three days after learning of this transaction and the bank recall, Egurrola's daughter went to confront Gracia. She accused him of involving her mother in "some type of fraud." He told her to keep away from him, not to come to his house, and never to call him because someone could be tapping his telephone line. Gracia did tell her he was trying to see if he could get any money back but that it was money Bonillas owed to others. He also told her not to worry because the bank had insurance. Gracia also had other relatives and acquaintances cash checks and wire money for him on several occasions.

Gracia did not testify at trial and called only one witness, criminal attorney Robert Hirsh. Hirsh testified that in early September of 1995, Gracia retained Hirsch because Gracia was concerned that law enforcement officers had been investigating some of his relatives. He told Hirsch that his brother-in-law Bonillas had come into some money while in prison and wanted Gracia to assist him with some transactions. Gracia told Hirsh that Bonillas had assured him that the activity "was on the up and up." At that time, Gracia gave Hirsh the two cashier's checks made out to Cardenas. Hirsh testified that he had lost Gracia's file except for the two checks and a letter. Hirsch stated that the letter had been sent from the state prosecutor's office in Tucson, requesting Gracia to come in and be "debriefed" on the matter of the bank transactions. The chief deputy of the state prosecutor's criminal division testified at trial that there was no record of Gracia having come to their office. However, an FBI agent testified that he had spoken to Hirsh, and Hirsh had told him that Gracia would cooperate with the authorities only if Gracia was granted transactional immunity.

On July 20, 1999, a grand jury sitting in the Southern District of Illinois returned a twenty-one count superseding indictment against fifteen defendants. Gracia, who was named in four of the twenty-one counts, pled not guilty. The remaining fourteen defendants pled guilty. Gracia's jury trial began on April 18, 2000, and he was convicted on all four counts.

On July 24, 2000, the district court entered judgment and adopted the probation officer's recommended finding of facts in the Presentence Investigation Report ("PSR"). Gracia filed several objections to the PSR. At the sentencing hearing, he presented no additional evidence and he restated his objections to the PSR. He maintained that while the facts in the PSR were "basically correct," he did not have the culpable mental state required to be convicted of conspiracy to commit money laundering because the evidence showed that he was merely an innocent dupe and was never aware of the underlying illegality of his actions. He objected to the recommended enhancement as a manager or supervisor, again because he was an innocent dupe, and also objected to an enhancement for using a minor to commit a crime, again because he had no idea he was committing an illegal act.

Gracia was sentenced pursuant to the 1998 United States Sentencing Guidelines ("U.S.S.G." or "the guidelines"). Under U.S.S.G. sec. 3D1.3, when multiple crimes are "closely related," the most serious count is used to determine the base offense level. In this case that count was conspiracy to commit money laundering, which had a base offense level of 23. The court added a two-point enhancement under sec. 3B1.4, on the ground that Gracia's offense involved the use of a minor, and then added another three points pursuant to sec. 3B1.1(b), finding that Gracia was a "manager or supervisor." Adding the two enhancements, Gracia's total offense level was 28. With no previous criminal history, Gracia's criminal history category allowed for a sentence ranging from 78-97 months. Gracia was sentenced to 60 months imprisonment for conspiracy to commit bank fraud and 78 months on the other three counts, with all sentences running

concurrently. Gracia was also ordered to pay $142,500 in restitution.

Gracia argues four issues in his notice of appeal: (1) that the district court erred in denying his motion for a directed verdict of acquittal on the conspiracy to commit money laundering because the government failed to present sufficient evidence that Gracia entered into any agreement with others to launder money, or that he knew of the specific objective of the conspiracy--that is, money laundering; (2) that the district court erred in applying U.S.S.G. sec. 2S1.1, applicable to money laundering offenses, because Gracia's charged conduct did not fall within the "heartland of conduct" covered by sec. 2S1.1; (3) that the district court erred in enhancing Gracia's sentence pursuant to U.S.S.G. sec. 3B1.1(b) on the ground that Gracia was a "manager or supervisor" of a criminal activity involving five or more participants; and (4) that the district court erred in applying sec. 3B1.1(b) without making sufficient findings of fact in support of its decision.

II.  ANALYSIS

A.  Money Laundering Conspiracy

Gracia maintains that the government did not produce sufficient evidence to convict him of conspiracy to commit money laundering, primarily because there was no evidence of criminal intent. In reviewing a sufficiency of the evidence challenge after a conviction, the evidence is viewed in the light most favorable to the government in order to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). Our review is highly deferential, see United States v. Barnes, 230 F.3d 311, 314 (7th Cir. 2000), and a conviction is reversed "only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt." United States v. Garcia, 35 F.3d 1125, 1128 (7th Cir. 1994).

Gracia was convicted of conspiracy to commit money laundering in violation of

18 U.S.C. sec. 1956(h), which states, "Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commis-sion of which was the object of the conspiracy."/6 The object of the conspiracy was money laundering in violation of sec. 1956(a)(1), which provides in pertinent part:

Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--

  (A)(i) with the intent to promote the carrying on of specified unlawful activity; or . . .

  (B) knowing that the transaction is designed in whole or in part--

    (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; . . . .

Gracia argues that the government "offered no evidence that [he] knowingly agreed with others to participate in a scheme to launder money, that [there was no evidence] he used 'proceeds' to 'promote' the scheme, or that he knew others were doing so," and that the case against him was built solely on inferences which were not grounded inevidence. The question to be determined is whether the government presented sufficient evidence to demonstrate that Gracia was knowingly involved with two or more people for the purpose of money laundering and that he knew the proceeds used to further the scheme were derived from an illegal activity.

  The record states that Gracia supervised multiple transactions with Angie and her husband Daniel and with his nephew Philip Mota. He also facilitated a transaction with his brother Frank and one with Bonillas' aunt. In addition, there was testimony that Gracia was involved in obtaining the bank account numbers of two other participants. There were transcripts of telephone calls between Gracia and both Hill and Bonillas. The

cumulative evidence reasonably indicates that Gracia knew, or should have known, he was involved in some kind of unlawful activity: the fact that prison inmates had sums in the amounts of $20,300, $15,000, $40,000, $29,000, and $22,000 to be deposited; the fact that the withdrawals had to be made before the deposited checks had time to be sent back to the bank on which they were drawn; the fact that he asked Cardenas if anybody had gotten caught or in trouble; and the fact that he told others not to come to his house or contact him. Beyond all of that, Gracia was there when his brother Frank threatened to go to the authorities and expose the scheme if Bonillas did not give him $3,000. Yet Gracia continued to participate. From these facts, a jury could, and did, infer that Gracia knew that he was involved in an illegal scheme and that he and others were using illegally obtained funds to continue the scheme. Circumstantial evidence is sufficient support, and may be the sole support, for a conviction. See United States v. Jackson, 983 F.2d 757, 766 (7th Cir. 1993). The record provided sufficient evidence for the jury to find guilt beyond a reasonable doubt. This finding renders Gracia's resentencing argument moot.

B.   U.S.S.G. sec. 2S1.1

Gracia argues that even if our review finds there was sufficient evidence to convict him of conspiracy to commit money laundering, because his conduct was "at the most incidental to the wire and bank fraud scheme run by the inmates," it falls outside the "heartland" of cases under sec. 2S1.1, and therefore, the money laundering count should not have been used to calculate his sentence.

Although the Supreme Court held that appellate courts should review the decision of a district court to depart from the guidelines under an abuse of discretion standard, see Koon v. United States, 518 U.S. 81, 100 (1996) (addressing "heartland" analysis), because Gracia did not object to the application of sec. 2S1.1 used by the PSR and the district court to calculate his sentence, we review only for plain error. See United States v. Olano, 507 U.S. 725, 731 (1993); United States v. Nance, 236 F.3d 820, 824 (7th Cir. 2000), cert.

denied, ___ U.S. ___, 70 U.S.L.W. 3235 (U.S. Oct. 1, 2001) (No. 00-9633) (applying plain error standard to any argument raised for the first time on appeal). To find a plain error, the error must affect a defendant's "substantial rights" and have "seriously affected the fairness, integrity, or public reputation of the judicial proceedings." Nance, 236 F.3d at 824.

Under the guidelines, sec. 3D1.2 requires that "[a]ll counts involving substantially the same harm shall be grouped together into a single group." The counts of conspiracy to commit bank fraud, bank fraud, and wire fraud all fall under sec. 2F1.1 of the guidelines for crimes of fraud, with the fourth count of conspiracy to commit money laundering falling under sec. 2S1.1. Section 3D1.2(d) specifies that offenses covered by secs. 2F1.1 and 2S1.1 are to be grouped together. Section 3D1.3(b) further specifies that with a group of closelyrelated counts under sec. 3D1.2(d), "[w]hen the counts involve offenses of the same general type to which different guidelines apply (e.g., theft and fraud), apply the offense guideline that produces the highest offense level." The base offense level under sec. 2F1.1 was 6. Section 2S1.1 provides for a base offense level of 23 if a defendant is convicted of money laundering under 18 U.S.C. sec. 1956(a)(1)(A). The guidelines mandated using the base offense level of 23.

A sentencing court "may ask whether there are features of the case that take it out of the 'heartland' of casesanticipated in the Guidelines." United States v. Crucean, 241 F.3d 895, 898 (7th Cir. 2001). The "heartland" of cases is the "set of typical cases embodying the conduct that each guideline describes." Koon, 518 U.S. at 93 (quoting U.S.S.G. ch. 1, pt. A(4)(b), intro. cmt. 4(b) (1995)). The guidelines "authorize district courts to depart in cases that feature aggravating or mitigating circumstances of a kind not adequately taken into consideration by the [Sentencing] Commission," id. at 92; that is, departure is allowed if "some unusual feature of the case takes it out of the heartland: the conduct at issue differs significantly from the norm even though the guideline linguistically applies."

United States v. Jaderany, 221 F.3d 989, 994-95 (7th Cir. 2000), cert. denied, 531 U.S. 1151 (2001) (citing Koon, 518 U.S. at 93-95).

A departure from the specific relevant guideline

is appropriate only in limited situations where an unmentioned factor places a case outside the heartland of cases contemplated by both the specific, relevant guideline(s) and the Guidelines as a whole. The Sentencing Commission views this departure power as quite limited and expects "that departures based on grounds not mentioned in the Guidelines will be 'highly infrequent.'" Koon, 518 U.S. at 94-96 (quoting U.S.S.G. ch. 1, pt. A(4)(b), intro. cmt.)).

United States v. Schulte, 144 F.3d 1107, 1109-10 (7th Cir. 1998). However, Gracia is not asking for a mere downward departure but wants us to simply disregard the money laundering count.

This same argument was addressed in United States v. Buckowich, 243 F.3d 1081 (7th Cir. 2001). In Buckowich, the defendant was convicted of wire fraud under 18 U.S.C. sec. 1343 and unlawful financial transactions under 18 U.S.C. sec. 1957. Id. at 1082. Because the guidelines treat sec. 1957 as a form of money laundering, the district court used the base offense level for money laundering in U.S.S.G. sec. 2S1.2(a) rather than the fraud count under sec. 2F1.1(a). Id. at 1083. Buckowich argued that her circumstances were not within the "heartland" of the applicable guideline. Id. at 1084. Buckowich, as did Gracia, relied on United States v. Woods, 159 F.3d 1132 (8th Cir. 1998). In Woods, the money laundering consisted of financial transactions which concealed funds from the bankruptcy court. The district court held that Woods' offense was a bankruptcy crime, therefore the money laundering guideline did not apply because "the underlying offense was . . . fraud, and not drug trafficking or some other offense typical of organized crime [as intended under sec. 2S1.2]." Id. at 1134-35. The Eighth Circuit agreed. However, the Seventh Circuit in Buckowich rejected this line of reasoning, stating that "Woods is incompatible with the law of this circuit. Buckowich was convicted

of both wire fraud and money laundering;
the judge in sentencing must consider
both offenses and may not act as if the
defendant had been convicted of just
one." Buckowich, 243 F.3d at 1084
(emphasis in original).

   Although not applicable to the 1998
guidelines used in Gracia's case, we note
that as of November 1, 2000, the
Sentencing Commission amended the
Statutory Index (Appendix A), specifying
which guideline section applies to the
statutory conviction. The Commission
wrote:

The amendment modifies secs. 1B1.1(a),
1B1.2(a), and the Statutory Index's
introductory commentary to clarify the
inter-relationship among these
provisions. The clarification is intended
to emphasize that the sentencing court
must apply the offense guideline
referenced in the Statutory Index for the
statute of conviction unless the case
falls within the limited "stipulation"
exception set forth in sec. 1B1.2(a).
Therefore, in order for the enhanced
penalties in sec. 2D1.2 to apply, the
defendant must be convicted of an offense
referenced to sec. 2D1.2, rather than
simply have engaged in conduct described
by that guideline. Furthermore, the
amendment deletes Application Note 3 of
sec. 1B1.2 (Applicable Guidelines) . . .
[which] note has been used by some courts
to permit a court to decline to use the
offense guideline referenced in the
Statutory Index in cases that were
allegedly "atypical" or "outside the
heartland."

U.S.S.G. App. C Supp., amend. 591, at 32
(2000) (emphasis added). This amendment
expressly rejects exceptions under the
"heartland" analysis.

   The district court correctly determined
there were no unusual circumstances and
the facts of Gracia's case fell within
the "heartland" of sec. 2S1.1. Gracia was
convicted of both fraud and money
laundering and, under the guidelines, his
base offense level must be the greater of
the two levels pursuant to the two
separate guidelines. The district court
did not err in setting Gracia's base
offense level at 23.

C.  U.S.S.G. sec. 3B1.1(b)

Gracia argues two issues under sec. 3B1.1(b): that the district court erred in enhancing his sentence pursuant to sec. 3B1.1(b) on the ground that he was a "manager or supervisor" of a criminal activity involving five or more participants; and that the court did not make sufficient findings of fact in support of its decision. Gracia maintains that "there is no way to conclude from the trial record that Mr. Gracia was a 'manager or supervisor.'"

Section 3B1.1(b) states, "If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels." A participant is "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. sec. 3B1.1, cmt. n.1. Whether a defendant is a manager or supervisor is a question of fact subject to the clearly errone-ous standard of review. United States v. Hall, 101 F.3d 1174, 1176 (7th Cir. 1996). A finding is "'clearly erroneous' when although there is evidence to support it, the review-ing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).

"The central purpose of sec. 3B1.1(b) is to punish a defendant for his relative responsibility within a criminal organization." United States v. Fones, 51 F.3d 663, 665 (7th Cir. 1995). If it is determined that a defendant had no greater role than any other participant, he cannot receive a sec. 3B1.1 increase. United States v. Mustread, 42 F.3d 1097, 1103 (7th Cir. 1994). In determining whether a defendant played a greater role as a manager or supervisor,

[f]actors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority

exercised over others.

U.S.S.G. sec. 3B1.1, cmt. n.4; Fones, 51 F.3d at 665 (list-ing cases). All factors need not be present, but the defendant must have "exercised some control over others involved in the commission of the offense." United States v. Pagan, 196 F.3d 884, 892 (7th Cir. 2000), cert. denied, 530 U.S. 1283 (2000) (citing United States v. House, 110 F.3d 1281, 1287 (7th Cir. 1997) (emphasis in original)). It is sufficient that the defendant orchestrated or coordinated the activities of others. Fones, 51 F.3d at 666 (citations omitted). While the criminal activity must involve five or more participants, to qualify for the increase as manager or supervisor, the district court had to find that Gracia had control over only one participant. U.S.S.G. sec. 3B1.1, cmt. n.2; Fones, 51 F.3d at 668.

The PSR noted that Gracia directed and supervised the actions of Angie, Daniel, and Mota: driving Angie to the bank, giving her money to open a bank account, driving her to withdraw money, driving her to cash a check and purchase money orders; driving Daniel to the credit union and instructing him to withdraw money, taking Daniel to Western Union and giving him money to send wire transfers to individuals unknown to Daniel; and giving money to Mota and driving him to Western Union to place wire transfers on two occasions. Although Angie, Daniel, and Mota were not charged as co-conspirators, all three testified at Gracia's trial as to the criminal scheme in which they were involved. Gracia also directed the actions of Bonillas' aunt and involved his own brother in the conspiracy. Bonillas' aunt also testified concerning her involvement in the conspiracy at Gracia's trial. In addition, as a mid-level manager, Gracia provided or directed large sums of money far greater than the $50 or $75 paid to the minor participants and received a correspondingly far larger share. Gracia not only recruited participants and claimed a larger share, but both the PSR and the record provide more than sufficient evidence that he coordinated and orchestrated the activities of Angie, Daniel, Mota, and Bonillas' aunt. He had a "real and direct influence" on those participants in the conspiracy. Mustread,

42 F.3d at 1103. The district court made no mistake in enhancing Gracia's sentence under sec. 3B1.1(b).

As to the findings of fact issue, it is true that district courts are required to make specific findings which present the evidentiary basis for a sentencing determination. See United States v. Johnson, 999 F.2d 1192, 1197 (7th Cir. 1993). Although Gracia is correct that the district court gave an abbreviated explanation in finding Gracia was a manager,/7 in addition to specifically adopting the findings of the PSR at the sentencing hearing, the district courtrelied on the evidence presented at trial and noted that the government "has certainly carried its burden of proof by a preponderance of the evidence regarding [the sec. 3B1.1(b)] matters." This circuit has held that the district court "must adopt the PSR's recommended findings or make independent findings sufficient to support its conclusion" in applying an enhancement under sec. 3B1.1(b). United States v. Patel, 131 F.3d 1195, 1203 (7th Cir. 1997). The district court not only adopted the findings of the PSR, which in turn are supported by the record, but referenced the evidence from the trial record concerning this enhancement when it noted that the government had satisfied its burden of proof. These statements make the findings sufficiently clear to support the sec. 3B1.1(b) enhancement.

III.  CONCLUSION

For the above stated reasons, we AFFIRM Gracia's conviction and sentence.

FOOTNOTES

/1 The government indicted fifteen co-conspirators, including Gracia. Gracia was the only defendant who went to trial. The other fourteen, including Frank, all pleaded guilty.

/2 Cardenas was also one of the fifteen indicted co-conspirators who pled guilty.

/3 Rolon was also one of the fifteen indicted co-conspirators.

/4 Although there are several spellings of her name in the record, this is the way she spelled it out at trial.

/5 Santos was also an indicted co-conspirator.

/6 Although the judgment indicates the conspiracy to commit money laundering was charged under "18 U.S.C. secs. 1343, 2," Count 21 of the indictment correctly reads "18 U.S.C. sec. 1956(h)--Conspiracy to Commit Money Laundering."

/7 The district court's only statements regarding the sec. 3B1.1 enhancement were:

Now, similarly, [Gracia] was a mid-level manager. In his own mind, he wasn't, but that's not the mental statement [sic] required here. He was over two or three people; maybe not in a formal sense that we think of as a floor manager in a factory, but in a legal sense, for purposes of the guidelines, he was a manager, so those objections have to be overruled. The Government has certainly carried its burden of proof by a preponderance of the evidence regarding these matters.