UNITED STATES of America,
Plaintiff–Appellee,

v.

Warren LIVINGSTONE, Defendant–Appellant.

No. 02–4088.

United States Court of Appeals,
Seventh Circuit.

Argued June 10, 2003.

Decided June 26, 2003.

Before KANNE, DIANE P. WOOD, and WILLIAMS, Circuit Judges.

## ORDER

Warren Livingstone pleaded guilty to possession of forged checks, 18 U.S.C. § 2315, and received a sentence of 30 months' imprisonment, three years' supervised release, and restitution totaling $14,045. He appeals his sentence, arguing that the district court clearly erred in adding three levels to his base offense level because of an alleged managerial role in the offense, which involved more than five participants. *See* U.S.S.G. § 3B1.1(b). Because it is quite obvious that Livingstone acted as a mid-level manager in a relatively sophisticated, multistate forgery ring, we affirm.

On April 14, 2002, a deputy sheriff in Pulaski County, Illinois, pulled over a vehicle for speeding. Livingstone and two women–later identified as Lindsey McWilliams and Danielle Stephens–were in the car. McWilliams, who was driving, admitted that she was unlicensed and consented to a search of the car. The search revealed seventeen checks totaling $59,639 and numerous forms of identification: state-issued identification cards, credit cards, and birth certificates. These articles proved to be forgeries. (PSR. at 5.)

Although initially denying involvement in anything illegal, Livingstone eventually

confessed his participation in a check-cashing scheme. The scheme operated out of New Jersey and New York, where members of the organization forged identification documents and checks written by phony businesses. The organization also maintained phone lines dedicated to fleecing those who called to verify that a particular (phony) business actually existed before honoring one of the forged checks. Livingstone's job was to recruit individuals like Stephens (who in turn recruited McWilliams), to redeem the checks at pawn shops and check-cashing facilities across the country. Livingstone's New York contacts would fabricate identifications and checks that he distributed to his recruits while traveling with them to various cities. The recruits cashed the checks and handed the proceeds over to Livingstone, who kept a third for himself, wired a third back to New York, and paid his recruits with the remainder. (Gov. Exhibit 1, Livingstone Confession Report, at 1–2.) Livingstone had participated in this scheme for over a year, traveling throughout the central and southern United States cashing bad checks. (*Id.;* PSR at 5.)

As he did before the district court, Livingstone argues on appeal that the above description of his role in the check-cashing scheme does not support the application of the managerial adjustment contained in § 3B1.1(b). His argument proceeds in the main by omission, ignoring such relevant facts as his retention of a greater share of illegal proceeds than those beneath him. He also points out that the government did not name or otherwise identify many others involved in the scheme, suggesting that there were actually quite a few people above him and that his alleged control over Stephens and McWilliams was insufficient to support the conclusion that he was a manager.

We review a sentencing court's application of § 3B1.1(b) for clear error, reversing only if left with the "definite and firm conviction" that a mistake has been made. *See United States v. Gracia,* 272 F.3d 866, 876 (7th Cir.2001). In applying § 3B1.1(b), sentencing courts are to look at "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, comment. (n.4). Not all of these factors must be present. *See Gracia,* 272 F.3d at 877. At minimum, the defendant must have "exercised some control over others involved in the commission of the offense," such as by orchestrating or coordinating the actions of accomplices. *Id.*

There is ample evidence that Livingstone managed or supervised others in the check-cashing scheme. His confession reveals that he orchestrated and coordinated the activities of Stephens and McWilliams by providing them forged identifications and forged checks, planning and funding check-cashing trips, and controlling when and how much they were paid. He also retained a greater share of the illegal proceeds for himself, and during his interrogation by the FBI analogized his position in the scheme to that of a "captain" in an organized crime family. (Gov. Exhibit 1, Livingstone Confession Report, at 1.) We have affirmed the application of § 3B1.1 on the basis of evidence less than or equal to this. *See, e.g., Gracia,* 272 F.3d at 876 (upholding adjustment where defendant recruited others, provided money to facilitate crime, and provided necessary transportation); *United States v. Pippen,* 115 F.3d 422, 424–25

(7th Cir.1997) (upholding adjustment where defendant had distributed cocaine through others, recruited at least one person, and was leader's "right-hand man"). Furthermore, the government was not required to prove that Livingstone was positioned above *many* others in the scheme; recruitment and direction of just one other person is enough to support the application of § 3B1.1(b). *See United States v. Hall,* 101 F.3d 1174, 1177 (7th Cir.1996). Here, Livingstone recruited Stephens and exercised control over both Stephens and McWilliams. Those facts support the finding that he was a manager regardless of his relative position within the scheme's organization as a whole. *Id.*

AFFIRMED.