UNITED STATES of America, Plaintiff–Appellee,

v.

Jim CLAY, Defendant–Appellant.

Nos. 93–3699, 93–3840.

United States Court of Appeals, Seventh Circuit.

Argued June 8, 1994.

Decided Oct. 6, 1994.

Steven Shobat, Asst. U.S. Atty., Crim. Div. (argued), Barry Rand Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for plaintiff–appellee.

Marc W. Martin, Genson, Steinback, Gillespie & Martin, Richard W. Stopka, Chicago, IL (argued), for defendant–appellant.

Before CUDAHY, ESCHBACH and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

For over a year, Jim Clay regularly purchased distribution-size quantities of cocaine from Hamdi Ayyash, a local drug supplier for several Chicago-area dealers. Clay financed his transactions with Ayyash on credit, with Ayyash maintaining a current ledger and Clay making payments on his account from the proceeds of the cocaine resales. After a bench trial Clay was convicted of both a substantive drug charge and conspiracy. He challenges (1) the sufficiency of the evidence supporting the latter conviction, contending that only a simple buyer-seller relationship was established, (2) the district court's relevant conduct findings at sentencing, arguing that its estimate of drugs attributable to Clay was inflated (and also mounting general constitutional and statutory challenges to the Sentencing Guidelines) and (3) the district court's refusal to adjust his offense level downward for acceptance of responsibility, asserting that he went to trial only to mount a conceptual challenge to the use of a conspiracy theory in his case, not to deny responsibility for what he had done. We affirm.

## I.

We have one housekeeping matter to dispose of before turning to address these contentions. Two notices of appeal were filed in this case, one on November 2, 1993, and the other on November 12, 1993, generating two appeals by Clay, Nos. 93–3699 and 93–3840. Why? The district court sentenced Clay on October 28 and the judgment order was entered on the docket on November 5. The November 2 notice was timely and proper under Fed.R.App.P. 4(b) (even though, because it was filed before the date of entry of judgment, it is treated as being filed on that date—November 5) and would have sufficed to secure our jurisdiction. A little confusion set in, however, after the district court, acting on its own motion, entered an order the next day, November 3, purporting to stay the October 28 sentence in order to reconsider the question of acceptance of responsibility in light of a recent decision of this court. On November 9, after a status hearing, the district court decided not to alter the sentence and issued an order (entered on November 10) vacating its October 28 order. Concerned about the impact these developments might have on his previous attempt to appeal, Clay filed a second notice of appeal on November 12. This he need not have done. The district court's November 3 order can only be understood (and is so understood by both parties) as notice that it was contemplating an exercise of its authority under Fed.R.Crim.P. 35(c) to correct a sentence within seven days after imposition; the court did not literally have the authority to stay execution of the sentence under the circumstances of this case, *compare* Fed.R.Crim.P. 38(b), but could within the bounds of Rule 35(c) fix a clear error (even one that only became clear in light of recent legal developments). The date of "imposition of the sentence" from which the seven days runs signifies the date judgment enters rather than the date sentence is orally pronounced, *see United States v. Morillo,* 8 F.3d 864, 869 n. 8; *United States v. Turner,* 998 F.2d 534, 536 (7th Cir.1993); *cf.* Fed.R.App.P. 4, 1993 advisory committee note to subdivision (b) ("[A] post-trial motion may be disposed of more than 10 days before sentence is imposed, i.e. before the entry of judgment"), and thus when the district court in effect denied its own 35(c) motion on November 9, it acted within the time constraints of the Rule.

Appellate Rule 4(b) makes clear that the "filing of a motion under Fed.R.Crim.P. 35(c) [does not] affect the validity of a notice of appeal filed before entry of the order disposing of the motion" and we read this statement to refer to all such "motions," whether made by the parties or the court itself. The 1993 advisory committee note confirms that as a general matter actions taken pursuant to Rule 35(c) will not vitiate a prior, properly filed notice of appeal. This is entirely consistent with the expectation of the drafters of Rule 35(c) that the seven-day window for correction of sentences would not prevent "the appellate process (if a timely appeal is taken) [from] proceed[ing] without delay and without jurisdictional confusion." Fed.R.Crim.P. 35, 1991 advisory committee note.* Although this version of Rule 4(b), which added the explication of the interaction with Rule 35(c), did not become effective until December 1, 1993—after the relevant dates in this case—the earlier Rule merely took a silent, not an opposing, stance. And in light of the clear design that Rule 35(c), enacted in 1991, not disrupt the usual process by which appellate jurisdiction is attained, we conclude that action under it has the same noneffect on a properly filed notice of appeal under the previous version of Rule 4(b) as it does under the current one. It would make little sense to complicate matters with a special rule for the two years it took to iron out the ambiguities that Rule 35(c) potentially portended for Rule 4(b) (but that Congress eventually insured it did not). Therefore, Clay's first notice of appeal adequately secured review of his conviction and sentence by this court; his second notice of appeal was

---

* On the other hand, when a defendant, who has not already filed a notice of appeal, files a timely Rule 35(c) motion (at least one which would affect substantial rights), the underlying judgment is rendered nonfinal for purposes of appeal until the motion is disposed of either explicitly or by inaction. *See Morillo,* 8 F.3d at 868–69.

superfluous and the docketed appeal that it spawned, No. 93–3840, is dismissed.

## II.

On to the merits. Clay's challenge to his conspiracy conviction is a familiar one. He insists that his relationship with his supplier, Ayyash, while continuous and ongoing, was clearly an arms-length and disinterested buyer-seller arrangement. Although the nub of a conspiracy is an agreement, a simple agreement between a buyer and seller to exchange something of value for cocaine cannot alone constitute a conspiracy because such an agreement is itself the substantive crime. *See United States v. Lechuga*, 994 F.2d 346, 349 (7th Cir.1993) (*en banc*); *see also United States v. Kozinski*, 16 F.3d 795, 808 (7th Cir.1994). The "something more" that is necessary for the existence of a true drug distribution conspiracy is a further understanding between the buyer and seller, often implicit, that usually relates to the subsequent distribution of the narcotics (though conceivably could, in an ongoing relationship, pertain to the prior procurement of the supply). Just how implicit that understanding can be to sustain a conspiracy, and how circumstantial the proof of it will typically be, was demonstrated in *Direct Sales Co. v. United States*, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943). There, the corporate petitioner was a drug manufacturer that sold much of its wares by mail order. A regular postal customer of the company was a certain Dr. Tate, a small-town physician, who frequently, and eventually exclusively, ordered massive quantities of morphine far in excess of what he could lawfully dispense in the course of his practice. Even after the Bureau of Narcotics informed the company that it was being used as a source for illicit redistribution and that an average physician would not legitimately require the size lots that it offered for sale, the company continued to sell to Tate unusually large amounts of morphine at a deep discount. Eventually the company was convicted of conspiring with Dr. Tate to illegally distribute the drug. The Supreme Court unanimously upheld a challenge to the sufficiency of the evidence.

The Court noted that the knowledge alone that one is supplying inputs to another's illicit business cannot support a finding of conspiracy. But knowledge is sometimes accompanied by an intent to further or cooperate in the secondary endeavor, especially when that endeavor is essential to bringing the seller's goods to market and the relationship is ongoing. And even without there ever being a formal statement of collaboration, as two parties continue on a course of conduct this intent can boil down to a tacit, albeit somewhat nebulous, agreement to further the buyer's redistribution project, the seller "join[ing] both mind and hand" with the buyer.

What sort of evidence will allow—and all we review for is bare sufficiency, *see United States v. Byerley*, 999 F.2d 231 (7th Cir.1993)—a trier of fact to make the inference that buyer and seller are dealing not just with disinterested eyes narrowly focused on the purchase at hand but with a mutual understanding about subsequent distribution? *Direct Sales* indicates that a prolonged and actively pursued course of sales coupled with the seller's knowledge of and a shared stake in the buyer's illegal venture is sufficient to sustain a finding of conspiracy. This court similarly has observed that when "A sells drugs to B who then distributes the drugs, and A 'knows of, and benefits from, B's subsequent distribution, we may infer a limited agreement to distribute between A and B.'" *Kozinski*, 16 F.3d at 808 (quoting *United States v. Townsend*, 924 F.2d 1385, 1392 (7th Cir.1991)). Such a future-oriented interest is difficult to infer from a single spot sale for cash, *see Lechuga*, 994 F.2d at 349–50, because once such a trade is completed and the parties part company neither has any particular reason to care about what the other does next (aside from steering clear of the police). But when a sales relationship is ongoing, seller and buyer will to some degree share an interest in the fortunes of the other: the buyer would like the seller to continue to have access to a supply and the seller would like the buyer to continue to have access to a market. When one of these cross-interests is of sufficient strength, an appellate court will be satisfied with a jury or trial judge's inference that an explicit or implicit (as in *Direct*

*Sales* where the only communication between the parties was by the sales brochures and order forms) agreement marked the relationship. Many things will inform this question of degree; for example the length of the affiliation, the established method of payment, the available supplying or marketing alternatives, the extent to which the transactions are standardized, and the demonstrated level of mutual trust. *See Lechuga,* 994 F.2d at 363–64 (Cudahy, J., dissenting in part). No one of these, or other, circumstantial factors will typically be dispositive because each is only an imperfect indicant of whether a true conspiracy existed. If enough point in the direction of a concrete, interlocked interest beyond the consummation of the individual buy-sell deals themselves, we will not disturb the conclusion reached by the finder of fact that at some point the association blossomed into a cooperative venture. *See generally United States v. Blankenship,* 970 F.2d 283, 286–87 (7th Cir.1992).

With the foregoing in mind, a brief examination of Clay's dealings with Ayyash reveals that they bear sufficient markings of interdependent interest to support the district court's finding of conspiracy. Clay was introduced to Ayyash in 1988 and made a single half-kilogram purchase at the time. Soon thereafter, after Ayyash had changed suppliers, Clay bought a second lot from Ayyash but was dissatisfied with the quality of product and for over a year rejected Ayyash's several solicitations for further sales. By the end of 1989, however, Ayyash resumed carrying better grade cocaine and Clay began to make regular purchases from him. It is at this point, the government alleged, that the conspiracy crystallized. After the first several exchanges, which were straight up, every two or three weeks to a month Ayyash would "front" Clay half-to two-kilogram quantities of cocaine, with the minimum size of each transaction increasing to one kilogram by the early part of 1990. Clay would pay for the purchases after he resold the cocaine to his customers. At the time of each sale, he and Ayyash would reach an agreement as to price, which fluctuated with market conditions. These transactions continued for over a year, with Ayyash and Clay contacting one another by pager (using an agreed upon code) and meeting periodically for cocaine deliveries and cash payments. Ayyash kept a handwritten record of Clay's account (as well as those of his other customers) which he updated with each sale and payment. A kilogram of relatively high purity cocaine mixture of the type that Clay was purchasing from Ayyash costs about $20,000, and therefore Clay, for over a year, was regularly servicing a debt that accumulated at a rate of several tens of thousands of dollars a month.

The district court, looking at the number and size of the transactions and the extent of Clay's resulting financial obligation to Ayyash, concluded that it is and always was more than evident that the only way Clay could pay for the drug deliveries was through their resale. Because, "[w]ith that mutual knowledge, these parties went ahead and dealt with each other on credit for a period in excess of a year," the court inferred "that they agreed with each other and had a meeting of minds with each other that Clay would resell the drugs he purchased on credit from Ayyash."

The evidence of an ongoing reciprocal interest in this case is clearly strong enough under our case law to support the inference of conspiracy drawn by the district court. Clay bought on credit, he did so regularly, the purchases were very expensive, the relationship was prolonged, the means of communication was settled, the business was risky. He was sophisticated; so was Ayyash. The conclusion that under such circumstances buyer and seller understood that resale would fund repayment (especially since Ayyash specifically testified to that effect) and that as the transactions recurred this understanding grew into a tacit agreement as to resale is comfortably within permissible bounds. *See United States v. Saunders,* 973 F.2d 1354, 1360 (7th Cir.1992); *United States v. Baker,* 905 F.2d 1100, 1106 (7th Cir.1990). And permissible is all it need be. We review only for sufficiency. *United States v. Willoughby,* 27 F.3d 263, 267 (7th Cir.1994). That the venture may not have been obviously cooperative in all of its attributes—e.g. price was negotiated afresh for each deliv-

ery—is not dispositive when there is clear evidence of a significant overlapping interest.

Clay also disputes the validity of the district court's initial inference that resale proceeds necessarily funded his ongoing debt to Ayyash and that all surely realized as much. His suggestions that he may have accumulated a separate store of cash from selling cocaine supplied by another source and also from winning big at the racetrack, however, are utterly speculative—the former stems from a single comment while posturing during negotiations to *buy* cocaine from an undercover agent purporting to represent Ayyash and the latter is based solely on the fact Clay liked to gamble. His hopeful conclusions rely on a reading of the record far more ambitious than what is appropriate on a challenge to the sufficiency of the government's evidence. It is clear that he bought hundreds of thousands of dollars worth of cocaine from Ayyash in the course of a single year. No indication exists that his luck with the horses was that good or that he was simultaneously profiting on a commensurate order on the side. It neither misstates the evidence nor misplaces the burden of proof, as Clay also claims, to conclude that, when one regularly purchases expensive quantities of cocaine on credit from a single supplier, does not make payments until after occasions for resale arrive and possesses no apparent alternative cash source for payments of such regularity and unusual size, buyer and seller understand that resales fund the purchases. The further and ultimate inference of conspiracy which, as discussed, can permissibly follow from this conclusion and the continual nature of the relationship is thus also valid.

### III.

Clay also raises several challenges to his sentence. First, he contends that the district court erred in refusing to award him a two-point adjustment for acceptance of responsibility pursuant to Guideline § 3E1.1. Although he went to trial on both the conspiracy and the possession with intent to distribute charges against him, Clay claims that his only purpose in doing so was to test the applicability of a conspiracy theory to his case. Because he eventually admitted guilt and was contrite at sentencing and never denied outright that he was involved in the drug business, Clay believes that the district court abused its discretion in refusing the adjustment. Although the adjustment "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential elements of guilt, is convicted, and only then admits guilt and expresses remorse," Clay insists his is the "rare situation" in which acceptance of responsibility has been clearly demonstrated "even though he exercise[d] his constitutional right to a trial." U.S.S.G. § 3E1.1, application note 2.

> This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g. to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

*Id.*

This case, however, is not a close one. Even if going to trial solely to mount a buyer-seller challenge to a conspiracy charge on undisputed facts is enough of a purely conceptual defense not to automatically preclude a downward adjustment for acceptance of responsibility, *but cf. United States v. Curtis,* 37 F.3d 301, at 309 (7th Cir.1994), and even if that is what Clay in fact did (despite, for example, his suggestions at trial that Ayyash's ledger was tampered with in order to overstate his involvement with Ayyash), Clay did not at all manifest the type of pre-trial acknowledgment of culpability that would compel the district court to grant an adjustment. In fact, before us he has pointed to no instance prior to his trial in which he overtly demonstrated any true acceptance of responsibility and so has not begun to show, let alone establish beyond reasonable dispute, that he had met his affirmative burden in this area. *See United States v. Kerr,* 13 F.3d 203, 205 (7th Cir. 1993); *Ebbole v. United States,* 3 F.3d 530, 535 (7th Cir.1993). As the district court

noted: "[W]hat Mr. Clay did was to admit the minimum he had to admit. [H]e is on tape with a drug agent, and he tried to establish a defense that would keep his liability to a minimum...." His late-in-the-day willingness to expand—and then only somewhat—on his wrong-doing does not render the district court's estimation of his penitence clearly erroneous.

■ Next, Clay disapproves of the district court's decision to attribute to him twenty-two kilograms of cocaine for the purpose of calculating his base offense level. All agree that the appropriate figure is the aggregate amount of cocaine that Clay purchased from Ayyash. See U.S.S.G. §§ 1B1.3 & 2D1.4(a); United States v. Cooper, 942 F.2d 1200, 1206 (7th Cir.1991). Clay disputes the district court's—and the probation office's (whose computations the court accepted)—determination of that figure. To arrive at the twenty-two kilogram total, the court began with Clay's two half-kilogram purchases from 1988 and 1989 and added to them a kilogram for every month from January, 1990 through September, 1991. The court selected this method, which generally speaking is an acceptable one, see United States v. Beler, 20 F.3d 1428, 1434 (7th Cir.1994), as a safely conservative response to Ayyash's approximation that he regularly sold cocaine to Clay during this period at two-week to one-month intervals, usually in quantities of one to two kilograms. The court found Clay's account of a total of just under five kilograms changing hands less credible than Ayyash's recollection and noted that what was preserved of Ayyash's notebook—Ayyash would retain only relatively recent entries—corroborated the latter's testimony. The court did not believe the book was doctored or fabricated.

Clay attempts to undermine the soundness of the district court's reliance on Ayyash's testimony, pointing to, for example, Ayyash's fuzziness about some of his specific transactions with Clay, Clay's unwillingness to buy cocaine from an undercover agent after Ayyash's arrest (although, judging from his recorded comments, this was only a temporary sentiment due to contemporaneous financial difficulties), and the alleged unreliability of Ayyash's ledger. We have examined the substance of these arguments, and find them unpersuasive as they either bear only tangentially on the accuracy of Ayyash's depiction of the relationship or are based too much in speculation for us to reject the district court's appraisal of them from its superior vantage point. Ayyash's testimony upon which the court relied was noticeably not characterized by the type of blatant internal inconsistency relating to the degree of a defendant's drug involvement which would require attention and resolution before the court could depend on only one aspect of the account in necessary derogation of another. See Beler, 20 F.3d at 1433–36. Furthermore, the accusations of tampering were only accusations, lacking substantial support; the district court was entitled to reject them. In any event, the alternative calculation offered by Clay, based on the premise that all but one of the purchases did not exceed a quarter-kilogram (and conveniently placing Clay just beneath a mandatory minimum), is clearly less grounded in the extrinsic evidence—which certainly shows Clay's interest in full-kilogram price quotes and his debt for full-kilogram amounts—than Ayyash's. When, in such circumstances, the district court is faced with the differing live accounts of two witnesses and selects one that is as, or more, plausible than the other, its credibility judgment, which at the outset we are loathe to second-guess, will virtually never be disturbed. See Anderson v. City of Bessemer City, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985); Kozinski, 16 F.3d at 820. The district court's effort to accurately estimate, while taking special care not to overstate, the drug quantities involved in this case was conducted in a nonarbitrary, objective and supportable manner. There was no clear error.

Finally, Clay challenges the application of a preponderance of the evidence standard to the determination of drug quantity at sentencing and argues that the Sentencing Commission lacked authority to enact the relevant conduct provision of the guidelines. We have already rejected such contentions, see Beler, 20 F.3d at 1432; United States v. Ebbole, 917 F.2d 1495, 1501 (7th Cir.1990),

which, in any event, Clay has waived by not presenting them to the district court.

AFFIRMED.