# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 02-1070

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

ARLENE F. DIAMOND,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Central District of Illinois.
No. 00 CR 20046—**Michael P. McCuskey**, *Judge.*

———————

ARGUED APRIL 9, 2004—DECIDED AUGUST 10, 2004

———————

Before BAUER, EASTERBROOK, and KANNE, *Circuit Judges.*

BAUER, *Circuit Judge.* Arlene F. Diamond was convicted of mail fraud, wire fraud, conspiracy to commit mail and wire fraud, conspiracy to conduct monetary transactions with the proceeds of illegal activities, and conducting monetary transactions with proceeds of illegal activities. She appeals; we reverse in part and affirm in part.

## I. Backgound

In 1994, Clyde Hood, a man who claimed to be one of only eight people experienced enough to trade international "Prime Bank Notes" announced that he had received a message from God who told him to use his expertise in the secretive and lucrative trading of Prime Bank Notes to "help the little people." Accordingly, Hood would allow investors to make as many hundred dollar loans as they liked to Omega Trust and Trading, Ltd. The money would be used to facilitate trades in Prime Bank Notes. Each unit, at one hundred dollars a piece, was promised a fifty- to-one return in less than a year. Furthermore, an investor could roll over his or her profits by reinvesting them into Omega, guaranteeing millions of dollars in return for a small initial investment.

That was the pitch. Like most things that sound too good to be true, it was; it was a scam. Hood was actually a retired electrician who had come up with the idea for a Prime Bank Notes scam through his association with other scam artists. Sad to relate, God had not spoken to Hood. The whole thing was completely fabricated.

Nevertheless, Hood worked hard in creating an image of legitimacy. For example, he created a database of the investors to facilitate communication between the investors (more properly, victims) and himself. Later, he set up a recorded message hotline to keep investors up to date on the status of Omega. The status of Omega was always the same; pay-out was just around the bend. Other written communications stated the same, often times including religious references and biblical quotations.

To accomplish this fraud, Hood enlisted the help of others. These individuals would market the scam and explain to potential investors that they could join Omega by sending their monies to Clyde Hood in cash, money order, or cashier's check. The investor would then receive a "Private

Party Loan Agreement" that purported to represent his or her interest in the Omega funds.

One such marketeer was Michael Kodosky. Arlene F. Diamond invested in Omega under Kodosky. She frequently contacted the hotline and Kodosky to check on the status of her investment. At some point between 1996 and 1999—specifically when makes no difference to this opinion—Diamond began marketing the Omega scam. In 1998 she met with Hood and asked him about the ongoing investigation into Omega and told Hood that she knew it was an illegal scam. She also told Hood that she knew a way to circumvent the law. She had two additional meetings with Hood which made it even clearer that she was aware that the Omega Trust and Trading transactions were fraudulent.

By the time she returned home from the first meeting with Hood, Diamond was sending out her own Private Party Loan Agreements, maintaining her own investor database and telling investors to make their checks payable to her as opposed to Hood.

By late 1998 or early 1999, after Diamond's third meeting with Hood, she was involved in the Omega scam up to her eyebrows. Various investors were told that they could receive their Omega updates from Diamond and that she was coordinating Omega activities for California. One such individual was Reverend Jody Boyd. Boyd, a retired minister who was earning income by housecleaning and passing out free supermarket samples, was informed that Diamond and Hood were setting up another Omega-like fund in Belize. Boyd declined to invest in that venture. When Boyd called again in the summer or fall of 1999, Diamond told Boyd that she had just attended a victory party for Omega. She asserted that George W. Bush and one of the Rockerfellers were in attendance, as they were on the Omega board of trustees. Pay-out was again delayed—this

time because George Bush, Senior wanted his son to get the credit for the economic boom inherent in creating so many millionaires.

Another minister, Reverend Greg Bryant accepted a request from Diamond to assist in secretarial work involving Omega. While assisting Diamond, Bryant saw large amounts of correspondence which referred to money sent to Diamond. The amounts were typically between one hundred and eight hundred dollars. He also answered Diamond's phone approximately ten times. These phone calls were usually from people asking about the time frame for Omega's pay-out. The callers were assured that pay-out was imminent.

By September 1999, Reverend Bryant was duped into investing in Omega. Diamond informed him that she needed the money quickly if it was to be invested. As per her instructions, Bryant sent Diamond two hundred dollars, payable to Diamond's account, New Hope Trust.

In November 1999, Diamond sent Bryant documents to open a trust for his Omega pay-out. The letter was marked, "URGENT!!! RUSH!!! Must be returned immediately!!" The sense of urgency led Bryant to believe that he must make any additional contributions to Omega immediately and he gave her an additional thousand dollars. When Bryant inquired about the status of Omega in early 2000, Diamond told him that pay-out was delayed by satellite limitations caused by sunspots and magnetism.

Later still, possibly in early 2000, Reverend Boyd called Diamond to get an Omega update. Boyd was told that Diamond had just attended another Omega victory party in San Francisco. Shortly after that conversation, Diamond sent Boyd a power of attorney document giving Diamond control over Boyd's finances. Boyd balked at signing such a document.

Linda Stark, who was involved in Omega as an investor since 1998 received the same message as everyone else; pay-

out was right around the corner. She received this message a number of times in 1998, 1999, and 2000. By 2000, Stark was instructed by Diamond that additional monies for investment should be deposited into Diamond's New Hope Trust account. Diamond also instructed Stark to send the money in cash via FedEx. The cash was to be wrapped in aluminum foil. Stark did so. After repeated calls about the status of Omega and consistently being told that pay-out was coming soon, Stark concluded that she had been defrauded—she was, of course, right.

One final individual's experiences with Omega deserve some attention because they show the depths of Diamond's exploitation. Neva McKibben met Diamond in 1999 while they were both working in the Omega offices in Mattoon, Illinois. McKibben was responsible for cleaning the offices, for which she received one hundred dollars per week. It was in this capacity that she overheard that Hood was involved in "offshore trading." McKibben asked Hood if she could invest $25,000 from an IRA into Omega. Hood refused to take her money but said that he would invest on her behalf. Diamond, however, lacked such a fine-tuned conscience.

In February 2000, Diamond asked McNibben about her Omega investment and the return Hood told her to expect. When McNibben said that Hood had promised a fifty-to-one return, Diamond told McNibben that she could get two hundred-to-one if she gave Diamond the money instead. Diamond told McNibben not to tell Hood about the arrangement. In less than six months, Diamond had swindled McNibben out of her family's entire retirement savings of $57,600.

By 2000 things were starting to go bad for the conspiracy. That year, various peripheral actors were subpoenaed to testify before a Grand Jury investigating Omega. Diamond schemed to interfere in the investigation by encouraging the witnesses not to testify. In one instance, she supplied a

witness with a legal-looking document which purported to excuse him from testifying. Another incident involved Diamond telling a subpoenaed witness that she was an attorney and advised the witness not to testify. When that witness failed to appear before the Grand Jury, she was summoned for a hearing before the Chief Judge of the Central District of Illinois. Diamond met with the witness after the hearing and asked for and obtained a written report on the hearing. Diamond then informed the witness that she would not need to appear before the Grand Jury again.

On August 28, 2000, the same month Diamond was arrested, a search warrant was executed on Diamond's Mattoon, Illinois apartment. Among the items seized were Omega-related documents, a notebook computer, and Diamond's passport. The passport indicated trips to Belize, Canada, and the United Arab Emirates. Among the documents were various Cease and Desist Orders from Hawaii and Missouri. Also included were documents prepared by Diamond that purported to make financial claims against governmental officials—judges, prosecutors, investigators, and such. Various e-mails were recovered. These messages were complaints from investors averring fraud on the part of Omega. Other e-mails from Diamond were responses to inquiries about investing in Omega. In those messages, Diamond told investors to send cashier's checks to New Hope Trust or to send cash wrapped in aluminum foil. There were also Private Party Loan Agreements and copies of checks written to Omega or Diamond. These loan agreements indicated a total dollar figure of just over $1.5 million. The warrant also turned up a fake Mexican Certificate of Deposit and a fake $100 million United States Federal Reserve Note.

When Diamond's notebook computer was analyzed, investigators found databases of Omega investors. The information went back as far as 1998. Another database purported to track the Omega investment amounts. Digging further, investigators found files on Diamond's Palm Pilot which

named bank information for banks in Belize, Dubai, the Cayman Islands, and Antigua. Also included on the Palm Pilot was a list of book titles, including *How to Hide Your Assets and Disappear* and *The Law of Fraudulent Transactions.*

Of the numerous bank accounts probably used by Diamond in perpetrating this scam, IRS agents analyzed three. The first of these was a Bank of America account in Diamond's own name. This account showed little activity—$3,100 went in and $3,100 went out during the thirteen month life-span of the account. Another Bank of America account, the New Hope International Trust account, with Diamond as general manager, showed deposits totaling $50,000. This money was deposited and withdrawn in three to four months. The final Bank of America account, the New Hope Trust account, with Diamond again acting as general manager, showed activity for three years. The deposits, which totaled some $1.8 million, were in the form of cash, checks, money orders, cashier's checks, and wire transfers in one hundred dollar increments. The bulk of these deposits were checks made payable to Arlene Diamond and New Hope Trust; others were payable to Omega. $1.5 million had been withdrawn from this account, of which $240,000 was definitively traced to Hood. The whereabouts of the remaining $1.25 million is still unknown.

Some months later, while incarcerated and awaiting trial, Diamond struck up a conversation with another inmate, Nelani Jackson. After failing to convince Jackson to invest in Omega, Diamond confided in Jackson that she was a con artist and that Omega was a scam. Digging the hole deeper, Diamond explained to her new "friend" that during the course of the scam, she would never use her own name when dealing with real estate, personal property, or utilities. She also explained that she would meet prospective investors in public places to keep her residence hidden. Deeper still—in relation to one of the more creative yarns—

Diamond explained that she and Kodosky had read an article about George Bush and a Rockerfeller meeting on the West Coast to discuss investments. The conspirators decided that it would make Omega look legitimate if they wove this real meeting into the tangled web of the Omega scam. Thus, we have the genesis of the Omega victory parties. She continued, telling Jackson that she discouraged refunds by telling investors that pay-out was just about to occur. Finally, Diamond told Jackson that some of the Omega money she had received went to Hood and some went to her own foreign bank accounts.

Obviously, with such large amounts of money flowing through Omega, something had to be done to launder the money. This process began in 1996 with Hood asking Chris Engel, a co-conspirator, to deposit Omega monies into fourteen various personal and business accounts controlled by Engel. Engel would then withdraw the money in cash or cashier's checks at Hood's direction. Often times, hundreds of times, in fact, Engel would withdraw cashier's checks to purchase real estate. Some of the approximately $4.5 million laundered by Engel was in the form of checks made out to Diamond and endorsed over to Engel by Diamond, or checks directly from Diamond.

From April 1999 to September 1999, Engel's sister, Susan Hoehne, assisted in laundering Omega funds by depositing them into her business account and then obtaining a cashier's check which she would then send to Engel.

Further laundering involved Miller Hardwoods, a sawmill started up with Omega money during the spring of 1998. Hood supplied Raymond Miller with approximately $1.4 million to get the mill up and running. Hood estimated that roughly $500,000 of the Miller Hardwoods start-up money came from Diamond's New Hope Trust account. The money provided to Miller was often in the form of cashier's checks purchased by Diamond and Bank of America.

In yet another transaction, Hood flew to Dubai, United Arab Emirates to purchase an oil refinery. Hood told Diamond about his intentions and directed her to wire $80,000 from her New Hope Trust account to his account at the Standard Charter Bank in Dubai. Diamond transferred the money as requested.

Apparently, Diamond liked the bank in Dubai enough to entrust $240,000 to it. She did this by transferring money from her New Hope Trust bank account and wiring it to the United Arab Emirates. A letter from Diamond to a bank employee also indicates that she wanted to send more money to her Dubai account.

At trial, Diamond testified on her own behalf and essentially denied all of the incriminating evidence presented therein. She claimed that she did not know Omega was a scam until Hood testified against her on June 11, 2001. She further denied knowledge of the cashier's checks that she had obtained in relation to the Miller Hardwoods account.

After the jury found her guilty of all the charges against her, Diamond proceeded to sentencing. The court found that Diamond was liable for the full amount of money involved in the Omega scam, as that amount was reasonably fore-seeable to her. She was ultimately sentenced to the lowest possible sentence under the guidelines—two hundred ten months imprisonment and three years of supervised release.

## II. Analysis

### A. Sentencing

Diamond's first argument is based on the fact that the district court sentenced her based on the entirety of the Omega proceeds. She argues that because she was not part of the conspiracy from its outset, she cannot be held liable for the entire loss. We review a district court's determination

of the money attributable to a defendant for clear error and its application and interpretation of the guidelines de novo. *United States v. Baker*, 227 F.3d 955, 964 (7th Cir. 2000). We will reverse for clear error when we are left with the firm and definite conviction that a mistake has been made. *United States v. Irby*, 240 F.3d 597, 599 (7th Cir. 2001).

Section 1B1.3 of the sentencing guidelines controls the determination of relevant conduct. That section allows a sentence to be based upon "all reasonably foreseeable acts and omissions of others in furtherance of the jointly under-taken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). However, this section is tempered by application note 2(ii) which says, "[a] defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant's joining the conspiracy, even if the defendant knows of that conduct." U.S.S.G. § 1B1.3, comment. (n.2(ii)). Failure to fol-low the commentary may constitute an incorrect application of the guidelines. U.S.S.G. § 1B1.7.

It is undisputed that Diamond was not a part of the con-spiracy at its conception. Since the guidelines clearly state that a defendant is not liable for that conduct which takes place before the defendant joins the conspiracy, we find that the district court committed clear error when it sentenced Diamond based on the entire Omega scheme. We therefore, vacate Diamond's sentence and remand for resentencing based on her conduct after her becoming a co-conspirator.

### B. Insufficiency of the Evidence

Diamond's next argument attacks her convictions for con-spiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), and conducting a monetary transaction with the proceeds of an illegal activity, in violation of 18 U.S.C. § 1957(a), for insufficiency of the evidence. When reviewing claims of insufficiency of the evidence, we view the evidence in the light most favorable to government.

*United States v. Reynolds*, 64 F.3d 292, 297 (7th Cir. 1995). The relevant question on appeal is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* We reverse only when the record contains no evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt. *Id.*

### 1.)  *Conspiracy to Commit Money Laundering*

To convict a defendant of conspiracy to commit money laundering, the government must show the defendant was involved with two or more people to launder money and that the defendant knew the proceeds used to further the scheme were derived from an illegal activity. *United States v. Gracia*, 272 F.3d 866, 873 (7th Cir. 2001).

As a housekeeping matter, we note that the evidence clearly supports Diamond's knowledge that the money involved was derived from an illegal activity. The money constituted proceeds from Omega. Diamond explicitly and repeatedly said that she knew Omega was a scam. Beyond this direct evidence of her knowledge, circumstantial evidence exists which also shows her knowledge—asking investors to send cash, which she knew to be untraceable; attempting to impede the Grand Jury investigation of Omega; the title of a book, *The Law of Fraudulent Transactions*, on her Palm Pilot; meeting investors at public places so as to hide her residence; and so on.

Diamond's first argument is based on the fact "money laundering criminalizes a transaction in proceeds, not the transaction that creates the proceeds." *United States v. Mankarious*, 151 F.3d 694, 704 (7th Cir. 1998). In other words, the predicate offense must be separate from the money laundering. *Id.* Diamond claims that the evidence at trial merely showed that she collected money which she sent to Kodosky or Hood and that she deposited Omega

funds into her New Hope Trust account. This is not enough, she argues, to convict her of conspiracy to commit money laundering.

While we agree that the predicate offense and the conspiracy to launder money cannot be separated with surgical precision, they are clearly distinct. Diamond did not simply collect money from Omega investors and send it away to Hood or, on the other hand, simply deposit that money into her New Hope Trust Account. Looking at the evidence, it is quite apparent that Diamond was actively involved with others in engaging in financial transactions to conceal the nature and source of the funds. The government rightly points out five transactions, or types of transactions, that show Diamond's intent to do so: (1) she endorsed and transferred Omega checks to Engel to deposit in his personal and business accounts; (2) she repeatedly purchased cashier's checks with Omega funds—some of which were structured to avoid Internal Revenue Service reporting requirements; (3) she repeatedly withdrew Omega funds in cash—which she knew to be untraceable and had discussed this property of cash with Hood; (4) she wire transferred Omega funds to a Dubai bank account to purchase an oil refinery; and (5) she wire transferred Omega money to her own account in Dubai.

Diamond attempts to limit the effect of this evidence by arguing that these transactions were all part of the predicate offense. Thus, she puts each of these transactions in the context of "[s]he collected money from Omega victims who believed Mr. Hood's pitch and sent that money where Mr. Hood told her to send it—usually to him." This is an oversimplification and overly broad description of the scheme.

Diamond did not simply send her investor's check, cashier's checks, or cash to Hood. Nor did she simply deposit the Omega funds in her New Hope Trust account. Instead, she went far beyond those simple actions and engaged in

various transactions that were clearly designed to conceal the nature and source of the funds. This concealment was not part of the predicate offense. We find that such actions, *in the aggregate*, are sufficiently distinct from the predicate crime to support a conviction of conspiracy to commit money laundering.

Diamond next argues that the evidence was insufficient to show an agreement to launder money. When a defendant joins a conspiracy, she joins an agreement rather than a group. *United States v. Townsend*, 924 F.2d 1385, 1390 (7th Cir. 1991). An agreement need not be explicit; a tacit agreement is sufficient to support a conspiracy conviction. *United States v. Clay*, 37 F.3d 338, 341 (7th Cir. 1994). There is no bar to using circumstantial evidence in proving the agreement. *Id*. A conspiracy may be shown by evidence which shows that the conspirator embraced the criminal objective of the conspiracy. *United States v. Severson*, 3 F.3d 1005, 1010 (7th Cir. 1993).

Numerous incidents support the finding of an agreement between the co-conspirators to launder money. Diamond's involvement in purchasing an Arab oil refinery, structuring transactions to avoid reporting requirements, the various conversations about cash and its untraceable nature, sending checks to Engel so that he could deposit them in personal and business bank accounts, and transferring money out of the country to Dubai all show that Diamond embraced the objective of the criminal conspiracy. While not dispositive in itself, the book title *How to Hide Your Assets and Disappear* was found on her Palm Pilot. Bank information regarding banks in Belize, the Cayman Islands, the United Arab Emirates, and Antigua were also found on her Palm Pilot. Putting all of this evidence together, it is clear that Diamond embraced the object of the conspiracy and we have no doubt that a reasonable juror could have found the conspiracy beyond a reasonable doubt.

### 2.) *Conducting a Monetary Transaction with Proceeds of an Illegal Activity*

Diamond's final argument is that there was insufficient evidence to support the conviction for conducting a monetary transaction with the proceeds of an illegal activity. In order to find Diamond guilty of this offense, the government needed to prove that she "derived property from a specified unlawful activity and that [s]he engaged in a monetary transaction involving that property." *United States v. Seward*, 272 F.3d 831, 836 (7th Cir. 2001); *accord* 18 U.S.C. § 1957.

As we noted above, the evidence clearly supports a finding that Diamond knew that Omega was a scam. Therefore, Diamond knew that the money from Omega was derived from an unlawful activity. The unlawful action falls within those "specified" by 18 U.S.C. § 1957—a point which Diamond does not argue.

The evidence also supports a finding that Diamond engaged in the monetary transaction. Bank records show that Diamond purchased a $30,000 cashier's check using her New Hope Trust account funds. This money was ultimately deposited in the Miller Hardwoods account. Hood testified that he told Diamond about Miller Hardwoods and that Omega money was being used for the sawmill. Under this demanding standard of review, we find that a reasonable jury could have found Diamond guilty as charged.

### III. Conclusion

Diamond was improperly sentenced based on the entire amount of money involved in the scam. This was an error because she was not a part of the conspiracy for its entire life-span. We vacate her sentence and remand for resentencing. Her convictions, however, are affirmed.

AFFIRMED in part, REVERSED and REMANDED in part

A true Copy:

Teste:

_____
***Clerk of the United States Court of
Appeals for the Seventh Circuit***