# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 02-1193

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAMES M. TURNER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 00 CR 20046—**Michael P. McCuskey**, *Chief Judge.*

ARGUED APRIL 9, 2004—DECIDED MARCH 3, 2005

Before BAUER, EASTERBROOK, and KANNE, *Circuit Judges.*

BAUER, *Circuit Judge.* James Turner was indicted for conspiracy to launder money, in violation of 18 U.S.C. § 1956(h), and conducting a monetary transaction with the proceeds of a specified unlawful activity, in violation of 18 U.S.C. §§ 1957(a) and 2. After a jury trial, Turner was found guilty of the conspiracy charge. His appeal includes issues related to his conviction, sentence, and various evidentiary rulings.

## I.  Background

James M. Turner was a friend of Clyde D. Hood who masterminded the Omega fraud. We discussed the scheme at length in *United States v. Diamond*, from which we now quote.

> In 1994, Clyde Hood, a man who claimed to be one of only eight people experienced enough to trade international "Prime Bank Notes" announced that he had received a message from God who told him to use his expertise in the secretive and lucrative trading of Prime Bank Notes to "help the little people." Accordingly, Hood would allow investors to make as many hundred dollar loans as they liked to Omega Trust and Trading, Ltd. The money would be used to facilitate trades in Prime Bank Notes. Each unit, at one hundred dollars a piece, was promised a fifty to one return in less than a year. Furthermore, an investor could roll over their profits by reinvesting them into Omega, guaranteeing millions of dollars in return for a small initial investment.

> That was the pitch. Like most things that sound too good to be true, it was; it was a scam. Hood was actually a retired electrician who had come up with the idea for a Prime Bank Notes scam through his association with other scam artists. Sad to relate, God had not spoken to Hood. The whole thing was completely fabricated.

> Nevertheless, Hood worked hard in creating an image of legitimacy. For example, he created a database of the investors to facilitate communication between the investors (more properly, victims) and himself. Later, he set up a recorded message hotline to keep investors up to date on the status of Omega. The status of Omega was always the same; pay-out was just around the bend. Other written communications stated the same,

often times including religious references and biblical quotations.

To accomplish this fraud, Hood enlisted the help of others. These individuals would market the scam and explain to potential investors that they could join Omega by sending their monies to Clyde Hood in cash, money order, or cashier's check. The investor would then receive a "Private Party Loan Agreement" that purported to represent their interest in the Omega funds.

*United States v. Diamond*, No. 02-1070, 2004 WL 16402, at *1 (7th Cir. Aug. 10, 2004).

The entire Omega conspiracy loss was estimated at around thirteen million dollars. With all of this money, Hood and the other conspirators needed a way to launder the proceeds of the scam. They did so in a number of ways. For one thing, they simply deposited Omega funds in personal or business bank accounts controlled by Hood's associates. These associates would then, at Hood's direction, withdraw the funds in cash and give it to whomever Hood designated. Another method of laundering Omega proceeds was to give interest-free loans to various individuals. This is how Defendant Turner entered the story.

In early 1997, Hood offered to lend Turner $97,000 interest free. Shortly after offering the loan, Hood presented Turner with $15,000 in cash and nine $9,000 cashier's checks. The checks were payable to William Revelle but Hood endorsed them over to Turner by signing Revelle's name to the checks. Hood gave Turner some advice—Turner was not to deposit the checks in any of the local banks for fear that those banks may question the source of the funds. Hood also explained that any transaction over $10,000 would be reported to the Internal Revenue Service.

Upon receiving the money, Turner executed a Promissory Note and Mortgage on 2913 Walnut, Mattoon, Illinois

("Walnut property"), as security for the loan. The documents named Patricia Hood, Hood's wife, as the lender, who was entitled to eight hundred dollars per month in repayment of the loan. Turner regularly made these payments.

In late 1997, Hood again "loaned" Turner a large sum of money to purchase land located at 3120 Marshall, Mattoon, Illinois, and various trucks and equipment for Turner's landscaping business ("Marshall property"). Turner paid $146,000 for the property, trucks, and equipment. The interest-free loan was to be repaid on a monthly basis to Patricia Hood in $1,300 increments.

In early 1999, Turner wanted to purchase a house at 3900 Western Avenue, Mattoon, Illinois ("Western property"). In need of approximately $156,000, Turner again obtained an interest-free loan from Hood. This time, Turner, Hood, and Chris Engel, one of Hood's co-conspirators, went to Hood's daughter's house to get the funds. While there, Turner and Engel watched as Hood removed approximately $156,000 in cash from a safe in the garage. When he gave the money to Engel, Hood informed him that he should take the cash to an out-of-town bank and purchase a cashier's check. Engel ultimately obtained a check from a bank in Farina, Illinois where he named the remittor as Advantage Information Technologies. Turner then used the check to complete the purchase of the Western property.

Turner wished to improve his property and hired Engel, who was both a contractor and a co-conspirator in the Omega scam, to build a bigger garage. Turner saw Hood pay Engel $40,000 for this work. The Western property also had an in-ground pool that needed repair and Hood gave Turner $7,000 to fix it.

Hood testified that the money used for these loans was obtained from Omega proceeds.

Turner's involvement with Hood did not end with the above-described transactions. In addition to the loans,

Turner allowed his name to be put on the titles of various properties that Hood had purchased, performed collections for Hood, delivered thousands of dollars of Omega money in cash to various persons, instructed others to structure deposits to avoid the attention of the IRS, structured deposits into his own bank account, and instructed others to destroy documents recording loans Hood had made.

Turner was ultimately indicted together with nineteen other individuals involved in the Omega scheme. Turner and Arlene Diamond were the only two who pleaded not guilty and went to trial. Turner was convicted of conspiracy to commit money laundering. The district court sentenced him to one-hundred-fifty-one months imprisonment and two years supervised release. This sentence was based on the entire amount of money involved in the Omega conspiracy. Turner appeals.

## II. Discussion

Turner takes a buckshot approach to this appeal, arguing nine full issues with subparts. We will address only those arguments which merit discussion.

### A. *Sufficiency of the Evidence to Convict for Conspiracy to Launder Money*

The first issue we address is an attack on the sufficiency of the evidence. The relevant question on appeal is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. We reverse only when the record contains no evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt.

To prove a conspiracy to launder money, the govern-

ment must "demonstrate that [the defendant] was know-ingly involved with two or more people for the purpose of money laundering and that he knew the proceeds used to further the scheme were derived from an illegal activity." *United States v. Gracia*, 272 F.3d 866, 873 (7th Cir. 2001); 18 U.S.C. § 1956(h). To prove the substantive offense of money laundering, the government must prove that the defendant engaged or attempted to engage in a financial transaction, knowing that the transaction involved the proceeds of specified unlawful activity, and that the defen-dant intended to promote the unlawful activity or knew that the transaction was designed to conceal the source, nature, location, ownership, or control of the proceeds. *Gracia*, 272 F.3d at 873; 18 U.S.C. § 1956.

As we noted in *Diamond*,

> When a defendant joins a conspiracy, she joins an agreement rather than a group. *United States v. Townsend*, 924 F.2d 1385, 1390 (7th Cir. 1991). An agreement need not be explicit; a tacit agreement is sufficient to support a conspiracy conviction. *United States v. Clay*, 37 F.3d 338, 341 (7th Cir. 1994). There is no bar to using circumstantial evidence in proving the agreement. *Id.* A conspiracy may be shown by evidence which shows that the conspirator embraced the criminal objective of the conspiracy. *United States v. Severson*, 3 F.3d 1005, 1010 (7th Cir. 1993).

*Diamond*, 2004 WL 16402, at *17.

Within this legal framework, it is clear that Turner was part of the conspiracy to launder money. Under this court's decision in *United States v. Esterman*, 324 F.3d 565 (7th Cir. 2003), we know that certain types of transactions may be indicative of a design to conceal. These include transactions surrounded in unusual secrecy, structured transactions, depositing ill-gotten funds into another's bank accounts, using third parties to conceal the real owner, or

engaging in unusual financial moves which culminate in a transaction. *Esterman*, 324 F.3d at 573. Multiple acts show that Turner was actively involved with Hood—and Engel to a lesser extent—in concealing the source of Omega funds. His convoluted, seller-financed and interest-free loan for the Marshall property; allowing his name to be placed on the titles of various pieces of real estate when the property actually belonged to Hood; structuring deposits into his own bank account; instructing others to structure deposits into their bank accounts; and leaving town to conduct transactions involving cashier's checks all show that he was attempting to hide the source of the funds. In showing that Turner attempted to conceal the source of the funds, the government proved that he embraced the criminal object of the conspiracy.

Turner's argument that the government failed to show concealment because his name was often used in connection with these transactions misses the mark. Turner's identity was not the one the conspiracy was attempting to conceal, as he was not the source of the ill-gotten funds; it was Hood. The entire reason for using Turner's name was to conceal Hood as the source of the funds.

The next relevant question is whether Turner knew that the money involved in his various transactions were the proceeds of an illegal act. Notice that the question is not whether Turner knew the *actual* source of the funds, merely whether he knew they were the proceeds of *some* illegal activity. *See United States v. Marzano*, 160 F.3d 399, 400-01 (7th Cir. 1998). Knowledge may be actual or constructive—by a showing of conscious avoidance of actual knowledge. *United States v. Rodriguez*, 53 F.3d 1439, 1447 (7th Cir. 1995). Knowledge may be inferred from circumstantial evidence. *Gracia*, 272 F.3d at 874. Looking at all of the evidence in this case when viewed in the light most favorable to the government, it is clear that Turner had knowledge of the illicit nature of the funds he was using.

Numerous transactions and aspects thereof show Turner's knowledge. First, the vast majority of the money involved in the Walnut property loan came in the form of structured checks made payable to William Revelle. Turner watched Hood endorse these checks with Revelle's name. Turner was also instructed not to deposit the money in a local bank for fear that local banks may have questioned the source of the funds. He was also instructed to structure the deposits to avoid scrutiny by the I.R.S. The convoluted nature of the Marshall property transaction also illustrated that something was amiss. The Western property transaction was similarly suspicious. Turner watched Hood remove $156,000 in cash from a safe in Hood's daughter's house. After receiving this money, it was taken to another out-of-town bank to be converted into a cashier's check. There is more.

Along with other shady acts, such as repeatedly putting the title of Hood's property in Turner's name, delivering large sums of cash, installing bug-detection devices in Hood's Omega office, and instructing others to destroy documents that evidenced Hood's loans, evidence suggested that Turner was actually aware of the Omega scam itself. In fact, Turner was approached by investigators as early as 1997, and again in 1998. In April 1999, Turner arranged a meeting between some individuals who had just returned from testifying at grand jury proceedings investigating Hood and Omega. At that time, Turner did not ask Hood about Omega. When asked why Turner did not ask about Omega, Hood testified that it was his belief that Turner already knew what Omega was.

Looking at all of this evidence in combination, it is silly to suggest that Turner did not know that he was dealing with ill-gotten funds. Any reasonable person watching all of these strange dealings would clearly believe something was amiss.

*B. Internal Revenue Service Agent Hinesley's Testimony*

  1.  Admissibility of Summaries and Underlying Bank
      Records

Turner next says that "[t]he court erred in admitting summaries of Turner's bank records and 'expert' testimony of I.R.S. Agent Hinesley." Agent Hinesley analyzed the bank records of Turner and his wife for the years 1995 through 2000. As such records were "voluminous," Hinesley prepared summary charts as permitted by Federal Rule of Evidence 1006. During pre-trial proceedings, Turner learned of the government's intention to use such charts at trial. At that time, Turner objected that the majority of underlying records were irrelevant and that summaries thereof would be unfairly prejudicial. The district court ruled against him and ultimately allowed the summaries at trial.

Claims of error in admitting evidence are reviewed for abuse of discretion. *United States v. Spiller*, 261 F.3d 683, 689 (7th Cir. 2001). We will reverse only when there has been a sure showing of abuse and resulting prejudice. *United States v. Conley*, 826 F.2d 551, 560 (7th Cir. 1987).

Turner does not argue that the summaries were inaccurate or that they were improperly created. Instead, he continues to argue that the underlying bank records are irrelevant and overly prejudicial. He buttresses this argument by stating that the vast majority of the money was totally unconnected to the Omega scheme. Suffice it to say that the bank records were not irrelevant.

The case was one involving money laundering, or the concealment of funds. Evidence which showed, for example, that Turner's unexplained cash deposits into his bank accounts exceeded his reported income has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Fed. R. Evid. 401. As for the money being unconnected to Omega, it is clear that much of the money Turner dealt with came from Hood, who was intimately connected to Omega. In other words, the summaries and underlying data were circumstantial evidence of the charge.

Next, Turner argues that the summaries, and the underlying records were overly prejudicial under Federal Rule of Evidence 403. Again, the driving force behind this argument is that, according to him, the money in the accounts was unconnected to Omega. As we have said, although the money may not be directly *traceable* to Omega that does not mean it was totally *unconnected* from Omega. The question at issue was whether the money that Turner was laundering represented the proceeds of *some* illicit activity.

Having found the evidence to be relevant and noting that Turner does not claim that the records or summaries were inaccurate, we find that the district court did not abuse its discretion in admitting the summaries. We give special deference to a district court's assessment of the balance between probative value and prejudice because that court is in the best position to make such assessments. *United States v. Brown*, 7 F.3d 648, 651 (7th Cir. 1993).

## 2. Expert Testimony under Federal Rule of Evidence 702

Turner argues that I.R.S. Agent Hinesley testified as an expert when she testified that certain transactions seemed to be structured to avoid I.R.S. reporting requirements and about a "typical money laundering conspiracy." There is no dispute that Hinesley was technically qualified to testify as an expert; her qualifications are found throughout her testimony. Turner's complaint in this respect is that the court failed to exercise its "gatekeeper" function. Because the record indicates that there is no question that Hinesley would have been accepted as an expert, we find any error in tacitly admitting her as an expert to be harmless.[1]

Turner's next argument is that the testimony that Hinesley gave amounted to nothing more than an opinion of guilt. We treat this claim as an argument premised on Federal Rule of Evidence 704 which allows testimony that embraces the ultimate issue but prevents the expert from giving an opinion as to whether the defendant possessed the required *mens rea*. Fed. R. Evid. 704. We review the district court's admission of evidence for a clear abuse of discretion. *Brown*, 7 F.3d at 651.

Because Federal Rule of Evidence 704(a) allows testimony which embraces the ultimate issue, we will look to Rule 704(b). That rule provides "[n]o expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or a defense thereto." On review, the question is whether the

---

[1] Turner failed to raise the issue of the government's failure to inform him of its intent to call an expert in his opening brief. The issue is waived. *United States v. Collins*, 361 F.3d 343, 349 (7th Cir. 2004).

expert referred to the intent of the defendant. *United States v. Love*, 336 F.3d 632, 647 (7th Cir. 2003). She did not do so. The question that was posed was, "what is the I.R.S. term used to describe the staging of these types of transactions?" To which Hinesley responded, "we would refer to this as structuring." This testimony is generalized as to how the I.R.S. would characterize such payments. It does not speak specifically to *Turner's* intent. In essence, Hinesley was stating the transactions were of the type that *looked* like structuring, not that they actually were structuring.

The remainder of Turner's complaints with respect to Hinesley's testimony all go to the same issue; whether certain questions were improper because they touched on Turner's *mens rea*. We decline to address these issues beyond noting that Turner himself opened the door to such questions on cross-examination.

*C. Sentencing*

Turner argues that the court erred in imposing his sentence based on the entire Omega scam loss amount. We review the factual findings for clear error and the application of those facts to the Guidelines de novo. *United States v. Baker*, 227 F.3d 955, 964 (7th Cir. 2000). We will reverse for clear error when we are left with the firm and definite conviction that a mistake has been made. *Id*.

In determining relevant conduct under the Guidelines, a defendant engaged in a jointly undertaken criminal activity is liable for all reasonably foreseeable acts performed in furtherance of the jointly undertaken criminal activity. U.S.S.G. § 1B1.3. However, "[a] defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant joining the conspiracy; even if the defendant knows of that conduct." U.S.S.G. § 1B1.3, comment. (n.2(ii)). So, the relevant question asks when Turner joined the conspiracy.

There is no evidence which points to Turner having entered the Omega conspiracy at its outset in 1994. The government's argument about the "cumulative" evidence does not support such a proposition. The cumulative evidence supports the conviction; that he entered the conspiracy at some point; that is not enough to hold Turner liable for the entire Omega loss.

The district court presumed that the jury's guilty verdict for the money laundering conspiracy supported a finding that Turner was engaged in the conspiracy during its entire life span. The indictment for conspiracy included over fifteen people. The fact that Turner was convicted of participating in the conspiracy is not a finding of precisely when he joined.

Subsequent to the briefing and oral argument in this case, the Supreme Court ruled that the Sixth Amendment is violated when a sentence that has been enhanced under the Guidelines based on the sentencing judge's determination of a fact (other than a prior conviction) results in a sentence that exceeds the maximum authorized by the facts established by a guilty plea or a jury verdict. *United States v. Booker*, No. 04-104 (U.S. Jan. 12, 2005). The Court also held that the Guidelines are no longer mandatory, but advisory in every case. *Id.*

In this case, Turner's sentence was enhanced by the judge's findings that he obstructed justice, that the money laundering was sophisticated, and that he was accountable for the entire amount of money laundered in the conspiracy. These enhancements exceeded the maximum authorized by the facts established by the jury's verdict. The judge treated the Guidelines as mandatory and sentenced Turner accordingly.

Turner's sentence is vacated and remanded for resentencing because of the error in imposing his sentence based upon the total amount of laundered money. Upon

remand, the court should resentence in light of the principles set out in *Booker*.

The other issues raised by Appellant are without substantive merit and will not be discussed.

AFFIRMED in part,
REVERSED and REMANDED in part

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*