# In the

# United States Court of Appeals

## For the Seventh Circuit

---

Nos. 01-2523, 01-2962

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

WILLIAM G. CURTIS and JAMELL L. ROUSON,

*Defendants-Appellants.*

---

Appeals from the United States District Court
for the Northern District of Indiana, Hammond Division.
Nos. 2:98 CR 78-03, 2:98 CR 78-02—**Rudy Lozano**, *Judge.*

---

ARGUED SEPTEMBER 13, 2002—DECIDED MARCH 31, 2003

---

Before POSNER, DIANE P. WOOD, and EVANS, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* Jamell Rouson and William Curtis were convicted on various counts related to their participation in a major drug conspiracy in Gary, Indiana, in the course of which two people were murdered. They now appeal from their convictions, claiming among other things that the evidence is insufficient to support the verdict and that it is impermissible for the government to rely on a single drug trafficking offense to support convictions under 18 U.S.C. § 924(j)(1) on two separate counts (one for each victim). Finding no error, we affirm.

**I**

The facts in this case are typical of modern crack cocaine conspiracies. The central figure was Tajuan ("Ty") Allen, who ran an elaborate crack distribution operation. Set against a backdrop of violent street gang turf wars and drug profit feuds, Allen's cohorts left behind them a trail of wounded and murdered friends and enemies, as they supplied huge quantities of crack to addicts in the Gary area before the police finally shut them down.

Although neither Rouson nor Curtis lived in the 22nd Avenue section of Gary, they both ran with the 22nd Avenue Boys, a neighborhood street gang affiliated with the Vice Lords. They were able to sell drugs on gang turf because of their relationship with Allen. Rouson, whom Allen met through a mutual friend, was described by Allen at trial as his "guy"—someone he could trust. And in fact Allen did trust Rouson to look after things at his crack houses while Allen was away taking care of other business. Curtis and Allen have known each other since grade school. Curtis operated as a dealer at Allen's various crack houses. Some testimony suggested that Curtis was told to stay away from Allen's drug operations for a time, but Allen admitted that he allowed Curtis to sell out of his house on at least one occasion after that order, because Rouson told him that Curtis had fallen on hard times and needed help getting back on his feet.

For their part in the crack cocaine distribution conspiracy, Rouson and Curtis were charged with conspiracy to possess with intent to distribute in excess of fifty grams of crack cocaine in violation of 21 U.S.C. § 846; employment of a minor in the distribution of crack cocaine in violation of 21 U.S.C. § 861(a)(1); two counts of the use of a firearm to commit murder in furtherance of a drug conspiracy for two separate killings in violation of 21 U.S.C. § 924(c) and (j); two counts of possession with intent to distribute more than

five grams of crack cocaine (Curtis was only charged with one of the possession counts) in violation of 21 U.S.C. § 841; and carrying a firearm during and in relation to a drug trafficking crime in violation of 21 U.S.C. § 924(c).

After a jury trial, Rouson and Curtis were both convicted on all charges stemming from their participation in the Allen crack cocaine conspiracy. The primary witnesses against them at trial were fellow conspirators-turned-government-informants (including Allen himself) who provided detailed testimony about the conspiracy's members and its operations. The testimony portrayed Rouson and Curtis as gang members and crack dealers whose affiliation with Allen enabled them to sell crack out of the different houses that he operated in the 22nd Avenue neighborhood. Although Allen described the conspiracy as a floating operation that shifted locations frequently to avoid police detection, the nuts-and-bolts of the business were fairly straightforward. Allen fronted, sold or lent crack to the individuals who sold out of his various crack houses. The drugs were cut and bagged by Allen and his co-conspirators on-site or at the "chill house" where Allen stored weapons and drugs, sold dealer quantities of drugs, and where members of the conspiracy went to "chill." Allen relied on the presence of multiple sellers to attract customers to his crack houses, and the sellers in turn served customers on a rotating basis. Occasionally, Allen even allowed individuals to sell from his houses drugs that they purchased from other dealers, all for the apparent purpose of better meeting the demands of the Gary market.

In addition to the drug charges, Rouson and Curtis were each charged with two homicides allegedly committed in furtherance of the conspiracy. The first count stemmed from the murder of Omar King, who was killed in a drive-by shooting as part of a back-and-forth exchange between rival gang members over drug turf. The jury heard testimony from Allen about Rouson's alleged confession to his role in

the King homicide. That confession inculpated Curtis as well. According to Allen, Rouson said that he and Curtis went on "a mission" to Marshalltown, a rival gang neighborhood, to take care of someone who was "slipping out there in Marshalltown." Allen understood this to mean that Rouson and Curtis "had killed somebody out there."

The jury also heard about the King killing from co-conspirator Donnell Hanyard, who pleaded guilty to the conspiracy charge and testified for the government. Hanyard testified that he pieced together the story behind King's murder based on two conversations that he had with Rouson over the course of a week. In the first conversation, Rouson told Hanyard to "watch out for Marshalltown, because beef on for life." Rouson refused to elaborate, and later that evening Hanyard's mother's home was riddled with gunfire by a "Marshalltown car," presumably in retaliation for the King killing. A week later, Rouson asked Hanyard how he planned to retaliate against Marshalltown for shooting his mother's house up, and it was during this conversation that Rouson told Hanyard that he had shot at a Marshalltown drug dealer while riding in a car driven by Curtis.

The second § 924(j) charge concerned the murder of Donterrell Hamilton. Rouson shot and killed Hamilton at Allen's direction after an incident in which Hamilton was suspected of stealing drugs from Curtis while the three sold crack together at one of Allen's crack houses. Allen testified that after Hamilton denied stealing Curtis's drugs, Allen suggested that Hamilton accompany Rouson and himself on a "mission" to the Delaney neighborhood. With Allen driving, Rouson and Hamilton rode out to a remote location where Allen told Hamilton that it was his "death day." Rouson then placed Allen's gun to the back of Hamilton's head, ordered him out of the car, and shot Hamilton ten times in the side, back and stomach; Hamilton died from his gunshot wounds. Rouson and Allen then hid the gun and

returned to Allen's crack house to tell the others that they had killed Hamilton. When Curtis expressed disbelief, Rouson, Hanyard and Curtis drove out to see Hamilton's body.

At the close of the government's case, Rouson and Curtis each moved for judgments of acquittal, which the district court denied. Their motions were renewed and denied again after the jury returned its verdict. The court sentenced Rouson to concurrent life sentences for the drug conspiracy, the possession with intent to distribute, and the employment of a minor in the conspiracy charges. He also received two life sentences and a sixty month sentence, all running consecutively, for his role in the two killings and for the possession of a semi-automatic weapon in relation to drug trafficking. Curtis was sentenced to life imprisonment on the conspiracy charge and two 480-month sentences for involving a minor in the drug conspiracy and possession with intent to distribute, all running concurrently. He also received two life sentences plus sixty years (again running consecutively) for the King and Hamilton murders and for carrying a semi-automatic weapon during the drug trafficking offense.

## II

### A.   Sufficiency of the Evidence

Both Curtis and Rouson challenge the sufficiency of the evidence in a number of respects. Curtis argues that the evidence was insufficient to support either the conspiracy charge or the charge relating to the Hamilton murder. Both Curtis and Rouson also claim that the evidence does not support their convictions for King's murder. Their task is a daunting one, as the standard of review that this court applies is necessarily rigorous. Our threshold inquiry is whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could

have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). We will overturn a conviction based on insufficient evidence only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt. *United States v. Menting*, 166 F.3d 923, 928 (7th Cir. 1999).

To convict Curtis of participation in the crack distribution conspiracy, the government first had to establish the existence of the conspiracy. *United States v. Pagan*, 196 F.3d 884, 889 (7th Cir. 2000). Proving the existence of a conspiracy under 21 U.S.C. § 846 requires proof of an agreement "to commit a crime other than the crime that consists of the sale itself." *United States v. Lechuga*, 994 F.2d 346, 347 (7th Cir. 1993) (*en banc*). This is not as difficult as it might sound, as the government need not prove an explicit agreement or an overt act. It must merely prove an understanding—explicit or implict—among co-conspirators to work together to commit the offense. *United States v. Sanchez*, 251 F.3d 598, 602 (7th Cir. 2001); see also *United States v. Shabani*, 513 U.S. 10 (1994) (21 U.S.C. § 846 does not contain an overt act requirement). While a mere buyer-seller relationship will not support a conspiracy charge, *United States v. Clay*, 37 F.3d 338, 341 (7th Cir. 1994), evidence showing a shared interest in continued sales over time is enough to permit the jury to draw the inference that a conspiracy exists. *Id.*

Once a conspiracy to deal crack cocaine is established, the government must prove (a) that Curtis knew of the conspiracy and (b) that he chose to associate "with the criminal scheme" to establish his role as a co-conspirator. *United States v. Jackson*, 974 F.2d 57, 59 (7th Cir. 1993). Curtis's participation can be proven entirely through circumstantial evidence so long as the government establishes beyond a reasonable doubt "an *inference* that the defendants agreed

among themselves to distribute drugs." *Pagan*, 196 F.3d at 889 (emphasis in original) (quotation marks omitted).

Curtis offers two reasons why he was not a co-conspirator: first, he argues that the individual relationship that he and Allen enjoyed did not have the earmarks of a cooperative venture, and second, that the crack sellers as a group were competitors, not collaborators. At most, according to Curtis, there was a buyer-seller relationship between himself and Allen. As evidence of this, he notes that Allen refused to front drugs for him, even though Allen regularly fronted drugs for other sellers; instead, Allen required Curtis to pay up front or to provide collateral to secure the drugs. This demonstrates a lack of mutual trust and interlocking interests between the two. In fact, Curtis concludes, the fact that allegations of missing drugs were often leveled when Curtis was present shows that he was actually an outsider or "pariah" to the conspiracy.

Even if the evidence indicates that Curtis occupied a spot on the conspiracy's fringes rather than at its center, that he purchased his drugs from Allen rather than receiving them on credit, and that he was told to stay away from Allen's crack houses for a period of time, this means only that Curtis may have played a less significant role in the conspiracy than certain others. Those facts do not compel a jury finding that he was not a member of the conspiracy. See *Thornton*, 197 F.3d at 254 ("one need not be at the heart of a conspiracy to be part of its web"). As various co-conspirators testified at trial, Curtis sold drugs from Allen's crack houses on numerous occasions before he was told to stay away sometime in late 1997 because of tension between Curtis and other co-conspirators. Moreover, Curtis's exile from the conspiracy was short-lived. On May 26, 1997, he was back again dealing out of Allen's Jefferson Street crack house.

Finally, the jury had before it ample evidence that might have supported Curtis's theory that the individuals who

sold drugs out of Allen's crack houses were competitors and not collaborators. The problem is, the jury did not adopt that characterization of the relationships. There was enough evidence in this record to support its conclusion and to establish that Curtis and the others shared an interest in the success of Allen's crack houses. See *e.g.*, *Menting*, 166 F.3d at 929 (noting that an alternative interpretation of the evidence "at the very most . . . suggest[s] that another rational jury might have" decided the case differently).

The failure of Curtis's effort to avoid liability for the Hamilton murder is tied to the fate of his conspiracy argument. Since we have found that the evidence was sufficient to establish Curtis's membership in Allen's crack distribution conspiracy, it follows that Curtis is criminally liable for the reasonably foreseeable acts committed by his co-conspirators in furtherance of that conspiracy. *Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946); *United States v. Doyle*, 121 F.3d 1078, 1091 (7th Cir. 1997). One of those acts was Rouson's brutal killing of Hamilton. Curtis claims that he should not be liable for this act of his co-conspirator because there was insufficient evidence to show that Rouson shot Hamilton in furtherance of the conspiracy. Curtis would have this court believe that Hamilton was shot solely because Allen had to cover the loss when Curtis's drugs disappeared, which, he claims, was too remote from the conspiracy to trigger *Pinkerton* liability. The government reasons that Allen ordered Hamilton killed to keep members of the drug conspiracy in line and to set an example that in-fighting and drug stealing among co-conspirators would not be tolerated. Evidence supporting both theories was presented at trial, and once again, the jury was entitled to choose the version urged by the prosecutors.

Moreover, in light of the testimony showing that the conspirators in this case frequently resorted to violence to achieve their goals, Curtis's argument that the killing was

not reasonably foreseeable is wholly without merit. Our conclusions thus far also mean that we have no need to address Curtis's argument that there was insufficient evidence to prove that he violated or aided and abetted someone else's violation of 18 U.S.C. § 924(j)(1). His liability as a co-conspirator is a form of principal liability, and there is thus no need to resort to aiding and abetting.

Both Rouson and Curtis challenge the sufficiency of the government's evidence linking them to the murder of Omar King. They criticize the government's case as consisting solely of Rouson's uncorroborated admissions, as told to the jury by co-conspirators Allen and Hanyard. While they are correct that an uncorroborated party admission is insufficient to support a criminal conviction, *Wong Sun v. United States*, 371 U.S. 471, 488-89 (1963); *Opper v. United States*, 348 U.S. 84, 90 (1954), they are wrong that the admissions here were uncorroborated. Corroborating evidence is required in cases of party admissions not to establish the admission itself, but rather to ensure its reliability. *United States v. Grizales*, 859 F.2d 442, 445 (7th Cir. 1988) (quoting *United States v. Bukowski*, 435 F.2d 1094, 1106 (7th Cir. 1970), *cert. denied*, 401 U.S. 911 (1971)). As then-Circuit Judge Stevens reasoned, evidence of the *corpus delicti* is sufficient under *Wong Sun* to corroborate a party confession. *United States v. Fleming*, 504 F.2d 1045, 1048 (7th Cir. 1974); see also *United States v. Baltrunas*, 957 F.2d 491, 494 (7th Cir. 1992) (evidence that bank robbery occurred sufficiently corroborates defendant's confession).

Rouson's various admissions were corroborated first and foremost by evidence of King's bullet-riddled body. In addition, the jury had before it testimony that a red car was seen driving away after King was shot, testimony that Rouson and Curtis rented a small red car from a drug addict, and ballistic evidence relating to the probable murder weapon(s). Furthermore, the testimony of co-conspirators Allen and Hanyard recalling Rouson's various

admissions concerning the role that he and Curtis played in the King murder was admissible hearsay against both Rouson as a party admission, FED. R. EVID. 801(d)(2)(A), and against co-conspirator Curtis, because the statements were "made during and in furtherance of the conspiracy." *Wong Sun*, 371 U.S. at 491. See also FED. R. EVID. 801(d)(2)(E); *Jackson*, 974 F.2d at 58-59 ("[O]ut-of-court statements of co-conspirators may be used . . . in conjunction with other evidence, [to] establish a defendant's participation in the conspiracy.").

This adds up to ample corroborating evidence to support the jury's verdict. We may not reweigh the evidence on appeal, and we thus reject these challenges to the convictions.

B.  Use of a Single Drug Trafficking Offense to Support Two Section 924(j)(1) Convictions

Both Curtis and Rouson were convicted for two violations of 18 U.S.C. § 924(j), which makes it an offense to kill a person in the course of a crime prohibited by 18 U.S.C. § 924(c) (drug crimes, and crimes of violence); each was convicted on one count for the killing of King, and on another for the killing of Hamilton. The predicate drug offense for each of these counts, however, was the same. Curtis and Rouson argue that "[t]he use of several guns in connection with a single drug offense amounts to only a single violation of § 924(j) even though more than one death occurs as a result." In their view, multiple § 924(j) convictions based on a single § 924(c) violation committed in the course of one drug trafficking offense violate the double jeopardy clause. In essence, they are asking us to extend the logic of *United States v. Cappas*, 29 F.3d 1187, 1190 (7th Cir. 1994), where we joined seven other courts of appeals and held that the use of several guns in the course of a single drug trafficking offense cannot support multiple

§ 924(c) convictions for the use of a firearm in relation to a drug trafficking crime.

The present case, however, is significantly different. We begin with the language of § 924(j):

> A person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm, shall—
>
> (1) if the killing is a murder (as defined in section 1111), be punished by death or by imprisonment for any term of years or for life.

The statute incorporates by reference a violation of § 924(c), which is a sentence enhancement provision that applies to crimes involving the use of a firearm "during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device)." 18 U.S.C. § 924(c)(1)(A). According to Curtis and Rouson, because § 924(j) requires a violation of § 924(c), it is "reasonable to conclude that Congress . . . intended to enhance the punishment of a defendant who through violation of § 924(c) additionally commits murder." This may well have been Congress's general intent, but it is a substantial leap to infer further that Congress did not intend in § 924(j) to punish each murder separately. At a minimum, there is nothing in the language of the statute just quoted that expressly requires the prosecutor to prove a separate drug trafficking offense in violation of § 924(c)(1)(A) for each charged violation of § 924(j).

A close reading of *Cappas* shows that such a result is not compelled by that case either. In *Cappas*, this court held that a defendant "cannot be convicted twice under § 924(c) for using two guns in connection with the *same* drug trafficking or violent offense," but if the jury finds "that a defendant used one gun in connection with a narcotics

distribution count, and another gun in connection with a general conspiracy (of which that distribution was a part), he may be convicted on two § 924(c) charges." 29 F.3d at 1190. In other words, where two separate predicate offenses exist, there is no problem with imposing two enhancements under § 924(c). *Cappas* and similarly decided cases from other circuits address an entirely different problem than the one we face here. In that line of cases, the courts focused on the imposition of multiple § 924(c)(1) convictions for each gun attributable to a defendant, even if the gun was "carried or 'used' in the same place and at the same time as other targeted guns." *United States v. Anderson*, 59 F.3d 1323, 1328-29 (D.C. Cir. 1995) (*en banc*); see also *United States v. Lindsay*, 985 F.2d 666, 674-75 (2d Cir.), *cert. denied*, 510 U.S. 832 (1993). Our problem has to do with the elements of a § 924(j) case, and whether the fact that a single element of one § 924(j) count also plays a part in a separate conviction (for § 924(j), or for that matter for a conviction under any other statute) amounts to a violation of the Double Jeopardy Clause.

Application of basic double jeopardy analysis under the familiar test of *Blockburger v. United States*, 284 U.S. 299, 304 (1932), shows that the answer must be no. By now it is axiomatic that to pass the *Blockburger* hurdle the two offenses each must require proof of an element that the other does not. *United States v. Dixon*, 509 U.S. 688, 696 (1993); *United States v. Asher*, 96 F.3d 270, 273 (7th Cir. 1996). Here, each § 924(j) conviction required proof of a different element: in one instance, the prosecution had to prove that the conspirators murdered King, and in the other, it had to prove that they murdered Hamilton.

Finally, it is worth noting that the result for which Curtis and Rouson are arguing would lead to the conclusion that in a drug conspiracy like this one, all but the first killing committed in the course of the conspiracy would not be covered by this statute (although they would obviously be

subject to a state prosecution for each murder, and proof of other federal substantive predicate offenses would also be possible). We will not presume that Congress intended such an outcome without far more explicit statutory language.

Finding no double jeopardy violation, we do not consider appellants' argument that it was plain error to impose two life sentences under § 924(j)(1).

### III

For the foregoing reasons, the judgment of the district court is AFFIRMED.

A true Copy:

        Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
