# In the
# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 02-1700, 02-1796, 02-2232, 02-2246, 02-2252,
02-2353, 02-2518, 02-2824 & 02-3998

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

IGNACIO MEDINA, LESLIE CHAMBERS, THOMAS ROSS,
GERALD PITTMAN, FIDELMAR CORTES, JOSE RODRIGUEZ,
WALDEMAR GONZALEZ, MARLON REGALADO, and
JUAN HERNANDEZ,

*Defendants-Appellants.*

---

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 CR 469—**Robert W. Gettleman**, *Judge.*

---

ARGUED SEPTEMBER 16, 2005—DECIDED DECEMBER 8, 2005

---

Before WOOD, EVANS, and SYKES, *Circuit Judges.*

EVANS, *Circuit Judge.* Seventeen members or associates of a Chicago street gang with a delightful name—the Maniac Latin Disciples—were charged in a 50-count indictment with drug and firearms offenses. Ten were convicted in a trial which lasted several months. Nine of the 10 now appeal their convictions; six of the nine also appeal their sentences.

The drug distribution conspiracy was uncovered through the usual investigative techniques. There were controlled

purchases by informants and undercover agents, seizures of narcotics and money, and visual surveillance by law enforcement agents. There were approximately 300 tape recordings of telephone conversations intercepted pursuant to court-authorized wiretaps, and there was information provided by former members and associates of the conspiracy. All of which led to the indictment, in which all defendants were charged with conspiracy to distribute narcotics, pursuant to 21 U.S.C. § 846. In addition to the conspiracy, some of the defendants were charged with substantive counts of possessing with the intent to distribute narcotics and with distribution of narcotics (21 U.S.C. § 841(a)(1)). Some were charged with using the telephone to facilitate the conspiracy (21 U.S.C. § 843(b)). Some were charged with firearms offenses (18 U.S.C. §§ 922(g) and 924(c)). Some of those charged entered guilty pleas with cooperation agreements and testified against the others; some simply entered guilty pleas; one had the indictment dismissed as to him; and one remains a fugitive. As we said, nine of those who proceeded to trial now appear before us.

Our nine appellants were convicted of the conspiracy to distribute narcotics as well as other substantive offenses. They were sentenced to concurrent terms. We relate only the controlling sentence. Ignacio Medina received a 121-month term; Leslie Chambers, 151 months; Waldemar Gonzalez, 160 months; Fidelmar Cortes, 235 months; Jose Rodriguez, 292 months; Marlon Regalado, 324 months; and Juan Hernandez, 360 months. Thomas Ross and Gerald Pittman received life sentences.

The general outline of the operation, as shown by the evidence at trial which we accept as true, is as follows. The gang was divided into approximately 24 sections, each known by the street intersection at which it was located: Beach and Paulina or Rockwell and Potomac, for instance. The sections were required to follow the rules established by the gang leaders. The gang members en-

gaged in both wholesale and street-level drug dealing. The core of the drug distribution conspiracy was comprised of Maniac Latin Disciple (MLD) members and associates who regularly distributed wholesale quantities of cocaine, crack, and marijuana. These quantities ranged from 1/8 of an ounce (an "eight-ball" in the trade) to nine ounces. These quantities were often broken down and repackaged into smaller quantities which were sold on the street corners and in drug houses. Lower-level members of the gang were required to take turns each day selling dime bags of crack cocaine in what they called "throw lines." What this means, according to the testimony of Jose Aguirre, is that the sellers on a given corner had to take turns. When a customer came, one person would sell to him and then go to the end of the line to wait his turn to sell to another customer. Other armed gang members worked security in order to protect the street corner from both the police and from rival gangs.

Ross, also known as "Outlaw," was a top-ranking MLD, who had what seemed to be a limitless supply of drugs. He became the principal supplier of cocaine and crack to the MLDs in about 1997. Ross had a crew of MLD helpers, including Cortes (aka "Fidel" and Bajia"), Marcos Zacarias ("Dusty"), Gonzalez ("Waldy"), and Regalado. Ross arranged the delivery of drugs to many individuals, in addition to the appellants. Ross's workers packaged and distributed drugs, picked up drugs and drug proceeds, and supplied the leaders of the other MLD chapters in order to get the drugs to the street sellers. Ross also ordered members of the MLD to use violence to protect MLD locations from encroachment by rival gangs.

Two other high-ranking members of the gang included the "Bum" brothers—Juan Hernandez aka "Bum" and David Hernandez aka "Little Bum." They each ran a street-corner chapter of the MLD. Jose Rodriguez ("Baby D") was a long-time member of the MLDs and completed a lengthy prison

term about 6 months before his arrest in this case. Immediately upon his release, he resumed his association with the MLD and its drug-trafficking activities.

Pittman was another senior member of the gang and ran a street-corner section. Later, he received large amounts of narcotics directly from Ross and distributed them to other MLDs and customers. Medina ("Nacho"), a member of the gang, and Chambers ("Black Les"), an associate of the gang, also received drugs from Ross to sell to their customers.

The members attended meetings and paid dues, which included portions of the narcotics profits. Dues were used to purchase weapons for the gang's use.

In this appeal from their convictions, the appellants join in contending that they must be retried because of bias on the part of the jury foreman and because the government changed its theory of the conspiracy during the trial, making the admission of evidence of gang affiliation improper. Medina, Chambers, Rodriguez, Hernandez, and Gonzalez claim that there was insufficient evidence to convict them of conspiracy; they say they had a mere buyer-seller relationship with Ross. Pittman claims he was denied his right to testify when the judge denied his motion to reopen the evidence to allow his testimony. Cortes contends that the judge abused his discretion in giving a supplemental jury instruction in response to a question from the jury, and he claims his trial should have been severed because he and Medina had mutually antagonistic defenses. Rodriguez also claims he should have been granted a severance. Hernandez claims that the testimony of Jose Aguirre, which involved Hernandez's leadership of the Beach and Paulina chapter from 1988 to 1990, effectively amended the indictment, which referred to activities "on or before the early 1990's." Obviously, some of these issues have more substance than others. While we have carefully considered them all, we will discuss at length those which, in our view, merit more thorough explanation.

As to the sentences, the three with the shortest terms, Medina, Chambers, and Gonzalez—apparently in an astute decision to leave well enough alone and not risk winning longer sentences—do not appeal. As to the others, the government concedes that Ross, Pittman, and Regalado must be resentenced and that Cortes, Rodriguez, and Hernandez are entitled to a remand pursuant to our decision in *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005).

The primary issue on appeal is a claim of juror bias, which, the defendants argue, requires a new trial. The district court disagreed. We review a decision to deny a motion for a new trial based on juror bias for an abuse of discretion, and a district court's decision will be reversed only if there is a strong indication of prejudicial error. *United States v. McClinton*, 135 F.3d 1178 (7th Cir. 1998). We are instructed that there are "compelling institutional considerations militating" in favor of appellate deference to the trial judge's evaluation of the significance of possible juror bias. *Arizona v. Washington*, 434 U.S. 497, 513-14 (1978). In fact, "due process does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). In most cases, the redress for assertions of bias is a hearing in which the defendant is given a chance to prove actual bias. In *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 556 (1984), the Supreme Court set out the standard for determining when potential juror responses during the selection process require a new trial: a party must first show "that a juror failed to answer honestly a material question on *voir dire*," and, if successful, then must demonstrate that "a correct response would have provided a valid basis for a challenge for cause."

In our case, the juror involved was a fellow named Andrew Heytow. Heytow, who has a college degree and owns his own company, had never been on a jury before

being called to service in this case. He became the jury's foreperson. At issue here are Heytow's answers to two written questions, numbers 11 and 12, given during the voir dire presided over by District Judge Robert W. Gettleman.

> Question 11. You will hear evidence in this case about alleged involvement with street gangs. Will this evidence affect your ability to be a fair and impartial juror in this case?

Heytow said he "had no problem" with number 11.

> Question 12. Whether you or any member of your family or a close friend belong to any group that:
>
>> * defends or opposes gun use or owner-ship;
>>
>> * deals with drug abuse;
>>
>> * deal with issues involving street gangs.

Heytow's response was, "I have no problem with number 12."

The claim that Heytow gave a materially false answer to question 12 was first raised in the reply brief in this court. We will return to that issue following a look at question 11, which is the one the defendants focused on in the district court. They argued that Heytow's answer to that question was materially false and that a correct response would have led to a "valid" challenge for cause. However, as is quite obvious, question 11 is subjective, making it darn near impossible to prove that a given answer was false. And in their attempt to prove that Heytow lied when he said he could be fair and impartial, the defendants presented at a post-trial hearing an argument that commentator Paul Harvey would call "the rest of the story."

A day[1] after the jury convicted the defendants, Heytow called the office of the United States Attorney and requested a meeting with the prosecutors so he could tell them things he thought would be helpful in future cases—to make things "more clear for a jurist." Within weeks of Heytow's call, the meeting was held. Soon afterwards, one of the prosecutors (AUSA Jon King) told one (or perhaps more, we're not sure) of the defense lawyers about Heytow's request and the meeting that followed. King, according to the defense, also said Heytow mentioned that prostitutes frequented the area around his business until gangs took over. Upon this acorn, the defense sought to grow an oak tree. Sensing from this scenario that Heytow was too cozy with the prosecutors, or that he had some sort of ax to grind against the defendants, the defense sought to establish that his answer to question 11 was a bold-faced lie. They first argue that the very fact that Heytow asked to meet with prosecutors and not defense lawyers evidences his bias against street gangs and shows that he was on the government's side. That he might have been biased, however, is certainly not the only, or most reasonable, conclusion which can be drawn from his actions.

As a preliminary matter, we note that Heytow's request for a meeting seems to us to be a bit odd. But odd things often happen during (and even after) trials, especially long ones. And regardless of how the request for the meeting struck Judge Gettleman, he observed:

> [J]urors are free to talk to any—we tell them this. Jurors are free to talk to anybody. I told this jury that, too. I tell every jury that. If the lawyers are out there and you want to talk to them, you're free to talk to them. That's what we do with our jurors.

---

[1] The government says it was approximately one week, but why quibble.

So they may tell you things you don't want to hear. They don't like the color of your tie or they don't like your witnesses or they don't like your case, or whatever. But that's what you're there—I mean, it's instructive in a way for lawyers to talk to jurors, as you all know.

We also note that Heytow's request to talk with the prosecutors came after months of trial and several days of jury deliberations resulting in guilty verdicts. At that point, the defendants' presumption of innocence was overcome. The government won. Heytow's role in the case was a closed book. That he wanted to talk to the government lawyers *after* the verdict says nothing about how he felt *before* trial.

Somewhat more on point is the defense contention that during his talk with the prosecution, as revealed by his testimony at the post-trial hearing, Heytow admitted to, in the words of the defense, "many years of negative experiences with street gangs . . ." and "extensive and adverse experiences with street gangs (and perhaps the very same gang of which eight of the ten defendants were members) . . . ."

We think this is first-degree hyperbole. During his post-trial hearing testimony, Heytow revealed that his business at 4900 West Bloomingdale in Chicago had "a couple windows broken" and there was graffiti on his building. Two pictures of Heytow's red brick building showing graffiti on the bottom couple of feet were admitted into evidence. Although it is difficult to make out what the graffiti says or means, with effort one can make out some letters and perhaps a pitchfork, which we'll presume refers to the Maniac Latin Disciples. Importantly, however, Heytow could not say whether the graffiti was the result of gang activity or just "kids in the community."

Heytow also stated that there had been a problem with prostitution near his business and that, once the prostitutes

were driven out, "a gang of kids had come in and they were there because they were no longer worried about who was going to monitor what was happening on Bloomingdale." Also at the hearing, Heytow acknowledged that sometimes he makes the "leap that the young people are part of gangs and sometimes they're not. But that's not based on direct . . . that I know they're part of gangs." The defendants characterize this testimony as equivocation— Heytow's minimizing his experience with gangs. That is one interpretation, but certainly not the only, or even the most defensible, one.

As we said, the graffiti which was on Heytow's building might well have been gang-, or even MLD-, related. The evidence falls short of showing, however, that Heytow knew what the graffiti stood for or that it rendered him unable to fairly judge the evidence in the case. He seemed to think of the vandals as kids—whether a gang or just in "a bunch." And, in fact, the graffiti looks to be the slapdash work of kids with a can of spray paint, not that of "graffiti artists" or, for that matter, of adult drug dealers. The defendants in this case were not just a bunch of kids breaking windows and spray-painting buildings, as the sophistication of the drug distribution system shows.

Furthermore, as Judge Gettleman noted, nearly everyone living in a big city has had an experience with gangs. He said, "We've all had experience with graffiti . . . either boarding a defaced El train or having a garage sprayed or something like that." In fact, the judge thought, it is possible to look at Heytow in a different light. He has a business and continues to operate it "in a district which at least according to his description is rather dicey. And some might take that as an indicia of his tolerance for that aspect of urban life that you've used to argue just the opposite."

So all in all, as to question 11 (the only one before the district court) which asked whether in the face of evi-

dence of gang activity the jurors could be fair and impartial, Judge Gettleman said he did not disbelieve Heytow: "I think he thought he could be fair."

Going beyond this, however, the judge did not close his eyes to the fact that the phrasing of question 11 was part of the problem. It, as is clear by now, asked only whether the jurors could be fair and impartial when faced with evidence of gang activity. It did not ask whether the jurors had experience with gangs, trouble with gangs, belonged to a gang, etc. It did not venture into absurdity and ask whether jurors liked gangs. As to the question, Judge Gettleman said:

> [T]he basic question is: Did he answer truthfully when he answered the voir dire question? Now, we can all go back and say, well, maybe we should compose a better voir dire question. This is the one that I have been using, I think I inherited it from one of my colleagues, and I am not going to use it. I don't want to go through this again, and I want to make sure that we answer—that we ask it a little more specifically.

The judge added that he did not deny anybody's suggestion that a more precise question, like "Have you had an experience with gangs?" be asked. Keeping his eye on the ball, the judge continued:

> That isn't the question we asked this gentleman.

In sum, Judge Gettleman held a hearing pursuant to *McDonough*. He thoughtfully and with an open mind considered the issues raised. His conclusion was that Heytow was credible and answered truthfully when he said he could fairly and impartially judge the evidence. We cannot say that the judge abused his discretion.

The defendants, however, also argue that, given the situation, Heytow's bias should be presumed. For this proposition, they rely on *Hunley v. Godinez*, 975 F.2d 316

(7th Cir. 1992), a case with an unusual set of facts which we found created an "extreme situation." The victim in the case was fatally stabbed in her Chicago apartment. Because there were no signs of a forced entry, the police concluded that an intruder gained entry with a key. The defendant in the case (Hunley, of course) was employed at a hardware store close to the victim's apartment and had done lock work there before the murder. Also, a nearby video store where the defendant also did lock work was recently burglarized.

When the jury considering Hunley's fate failed to reach a verdict after the first day of deliberations, the jurors were sequestered in a hotel for the night. That night, while the jurors were asleep, a burglar made an unforced entry into two of the jurors' rooms (apparently two jurors were assigned to each room) with a pass key. Several items belonging to the jurors were snatched. The burglar did not discriminate as two of the four juror victims had voted to acquit Hunley during deliberations that day, while the other two thought Hunley was guilty. And all 12 jurors, quite naturally, discussed the burglary among themselves, and all were asked by the police to check their valuables.

Under these unusual and compelling circumstances, we affirmed a finding of implied bias, while at the same time making very clear that "the 'implied bias' test should rarely apply." *Hunley*, at 320. In fact, cases cited in *Hunley* where implied bias is found involve crimes very closely related to the ones at issue in the trials in which the jurors are sitting. *See Burton v. Johnson*, 948 F.2d 1150 (10th Cir. 1991), and *United States v. Eubanks*, 591 F.2d 513 (9th Cir. 1979). On the other hand, in a situation more like, but also more egregious than, the case before us, bias was not implied. The Supreme Court in *Smith v. Phillips*, 455 U.S. 209 (1982), did not find implied bias when, during the trial, a juror submitted an application for employment as a felony investigator in the office of the district attorney, whose staff

was prosecuting the case. If there is no implied bias in that situation, we would be hard-pressed to find it in the present case.

We will also consider issues raised by question 12, not without noting, however, that the allegations of bias in this case seem to be something of a moving target. As we said, this issue was raised for the first time in the reply brief.

Question 12 is a direct question, seeking objective information. The issue is whether Heytow answered truthfully when he implied that he did not belong to any group which dealt with issues involving street gangs. Appellants claim that the facts show that Heytow did, in fact, belong to a "group" which dealt with street gangs.

The facts show that he and some of the other area business owners worked together on neighborhood problems. The issue, then, is whether that means necessarily that he belonged to a "group" that "deals with issues involving street gangs" and that therefore his answer to question 12 was false. We are not convinced that it does. Question 12 involves three kinds of "groups": those that defend or oppose gun use or ownership, those that deal with drug abuse, and those that deal with "issues involving street gangs." A prospective juror could easily read the question and conclude that formal groups with formal membership—for instance, the National Rifle Association—are what the question refers to, not to neighbors working together to deal with graffiti and broken windows. Without more insight into his thought processes—which could have been ferreted out had the district court been told of the claim—we cannot say that Heytow answered the question falsely. He did not have membership in any organized group; he simply worked with his neighbors on neighborhood issues.

On this point, *McDonough* (464 U.S. 548) is instructive. It involved a claim for damages arising because a child's

feet "came in contact with the blades of a riding lawn-mower." At voir dire, prospective jurors were asked whether they or their immediate families had "sustained any severe injury, not necessarily as severe as Billy, but sustained any injuries whether it was an accident at home, or on the farm or at work that resulted in any disability or prolonged pain and suffering . . . ?" A man, who eventually became a juror, did not affirmatively respond to the question. Later, it was discovered that his son received a broken leg as a result of an exploding tire. After discussing answers from some of the other prospective jurors, answers which revealed that the jurors had different understandings of what sort of injury was "severe," the Court determined that the man's answer to the question was not dishonest. The Court summed up in language applicable to the present case:

> To invalidate the result of a 3-week trial because of a juror's mistaken, though honest, response to a question, is to insist on something closer to perfection than our judicial system can be expected to give.

At 555. In the case before us, we cannot say that Judge Gettleman abused his discretion in his evaluation of Heytow's answers or that the situation calls for invoking the rare finding of implied bias.

We now turn to the claim that the judge abused his discretion when he denied Pittman's motion to reopen the case and give testimony. The court has discretion in deciding whether to reopen the evidence even when the request involves such an important issue as a defendant's right to testify. *Morris v. Slappy*, 461 U.S. 1, 13 n.5 (1983). In evaluating a request to reopen evidence, the court can consider whether the evidence is relevant and ad-missible, whether it is timely, whether admitting the evidence would distort its importance, whether the par-ties would be prejudiced, and the reason for the untimeli-ness. *United States v. Bayer*, 331 U.S. 532 (1947).

Toward the end of the trial, Judge Gettleman, in discussing scheduling, noted that there was at least a possibility that Pittman would be testifying. On March 19, 2001, Pittman's counsel stated to the court that, in fact, he thought Pittman would testify. Counsel said he advised Pittman that he had a right to testify but said that he had advised against it. For one thing, counsel thought the testimony would open the door to evidentiary matters which, up to that point, the government had not been allowed to explore. Counsel expected that other defendants would object on the basis that a door, better left closed, would be opened. And, in fact, their objections were vigorous. Secondly, counsel indicated his own discomfort with the testimony:

> Your Honor, I may be asking for a more unusual procedure in testimony in that there are certain questions and answers which I do not want to elicit that I don't want to participate in that inquiry and the defendant wants to testify to.

Counsel was weighing Pittman's constitutional right to testify and his own ethical obligations.

After a lunch break, Pittman was apparently prepared to testify. Counsel resolved his ethical dilemma by his intention to ask "a fairly open-ended question"; he indicated that the government had agreed that was the proper way to proceed. (As an aside, we note, however, that the government had no objection to Pittman's testimony and may have welcomed it.) Because one of the defense lawyers noted that he probably would not have objections to questions but that he might have objections to Pittman's answers, Pittman was cautioned to be vigilant to stop his answer if an objection was lodged. Apparently not entirely satisfied with those ground rules, the judge remarked that one way to handle the objections was to have a voir dire of Pittman prior to the actual testimony.

Suddenly, at this point, counsel said the issue was moot; that Pittman had decided that he did not want to testify. The judge informed Pittman again that he had an absolute right to testify and an absolute right to decline to do so. Pittman was asked whether he understood, and he said he did. The judge said, "And is it your choice not to testify?" Pittman answered, "Yes, it is." The testimony portion of the trial ended that day—March 19. The judge informed the jury that testimony was completed and sent them home to return on April 2 for instructions, closing arguments, and deliberations.

Then, 2 days later on March 21, court was convened without the jury to consider defense motions and jury instructions. Pittman asked to address the court personally and asked to reopen the evidence in order to testify. He claimed that when he decided not to testify, he was pressured by his codefendants. His counsel, on the other hand, stated that when Pittman originally made his decision not to testify, his reasons seemed sound. Pittman's request was denied.

It was not until April 17, when Pittman filed a pro se motion for a new trial, that he alleged that the only reason he decided not to testify was that the other defendants "threatened" him with harm or death if he did. On May 31, counsel filed a motion for a new trial on the grounds that Pittman's right to testify was abrogated, and on July 11 an evidentiary hearing was held. It was then that Pittman, supported by defendant Chambers, testified about the alleged threats which convinced him not to testify. The judge correctly perceived his task as determining whether Pittman was simply "pressured" in some way, or whether he was told, for instance, "If you testify, I'll kill you or I'll beat you up or I'll harm you in some way."

Ultimately, the judge found the story of the threats unconvincing because Pittman never told anyone about them: "[T]here was just no reason for him not to tell me

what had happened or to tell you and then you could have let me know what had happened."

He continued:

> I might have taken an entirely different approach, because we still had the jury in the box, we still had, you know, an opportunity, even though I think it would have been procedurally unorthodox and it would have, you know, skewed or turned it on its head or whatever else you want to say for the reasons I didn't grant the motion at that time.

The judge concluded that Pittman had not met his burden. Looking at the record as a whole, we cannot say that Judge Gettleman abused his discretion in refusing to reopen the case to allow Pittman's testimony. The testimony may have contained perjury. It may, in fact, have been harmful to him. And Pittman waited too long to present his story of potential danger to him if he testified.

Five of the defendants—Medina, Chambers, Rodriguez, Hernandez, and Gonzalez—contend that the evidence was insufficient to convict them of the conspiracy count. They say they were mere buyers of narcotics, not conspirators.

A conspiracy under 21 U.S.C. § 846 requires an agreement between two or more people to possess with the intent to distribute narcotics. It requires that each defendant have joined the agreement knowingly and intentionally. *United States v. Gardner*, 238 F.3d 878 (7th Cir. 2001). A conspiracy can be established by circumstantial evidence. *United States v. Brisk*, 171 F.3d 514 (7th Cir. 1999). However, the agreement must amount to more than simply a sale of the drugs themselves; there must be "an understanding—explicit or implicit—among co-conspirators to work together to commit the offense." *United States v. Curtis*, 324 F.3d 501, 505 (7th Cir. 2003). The defendants must have known

about the conspiracy and have chosen to associate with the "criminal scheme." *Id.*

A conspiracy is distinguished from a buyer-seller relationship by evidence of a "prolonged and actively pursued course of sales, coupled with the defendants' knowledge of and shared stake in the illegal venture." *United States v. Suggs*, 374 F.3d 508, 518 (7th Cir. 2004). Factors considered in determining what sort of relationship exists include whether there was prolonged cooperation between the parties, a level of mutual trust, standardized dealings, and sales on credit (known as "fronting"). The quantity of drugs involved is also a consideration. *Id.* The factfinder must judge where on a continuum between buyer-seller and conspirator a defendant's actions lie. In this case, a properly instructed jury found that the five defendants were conspirators.

Our evaluation of whether the evidence was sufficient to sustain the conviction requires us to examine the evidence in the light most favorable to the prosecution and determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). As to each defendant, we find the evidence sufficient.

The evidence linking Medina to the conspiracy comes primarily from the wiretaps. He argues that the "Nacho" referred to on the tapes is someone else with that nickname, not him. There is sufficient evidence, however, to show that Nacho is Medina and that Medina is a conspirator.

Medina's nickname was Nacho and he is the only "Nacho" who ordered drugs from Ross. None of the speakers ever expressed doubt about who Nacho was. In fact, it appears from the wiretaps that the participants knew Nacho and had a regular spot at which they met him. The tapes show that he ordered significant quantities of drugs—on one tape two pounds of marijuana and on another four and a half

ounces of crack. One can also infer that Ross fronted drugs to Nacho. Nacho said he was getting drugs from Ross because another supplier required him to pay up front—apparently in contrast to Ross. Nacho is also listed on Ross's drug ledger as owing $2,750. Although the defendants attack the clarity of the drug ledger, we can't expect that drug dealers will keep the kind of meticulous records maintained by the editors of "Total Baseball" ("The Ultimate Encyclopedia of Baseball"). Viewed in the light most favorable to the government, the evidence was sufficient to sustain Medina's conviction.

Chambers was apparently less involved with the conspiracy than some of the others, but the evidence is, nevertheless, sufficient to sustain his conviction. He was aware that the goal of the conspiracy was to distribute narcotics, and he acted to further the goal. A fair inference is that Ross supplied him with cocaine from December 1998 until June 1999. Furthermore, the drug ledger showed that in June 1999 Chambers owed Ross $1,175. Within a 5-day period, Chambers twice asked to be supplied with more than user quantities. Chambers, in fact, on two occasions referred to specific persons he was selling to. Chambers was not an MLD member but was nevertheless allowed to sell at an MLD corner, allowing an inference that Ross trusted him.

Jose Rodriguez was a long-time member of the MLDs but had been in prison for a long period of time and was released on November 23, 1998. Not wasting much time, he called Ross on December 16. Rodriguez told Ross he wanted to start working with him. Ross gave him a zone in which to sell and started supplying him with drugs. In April 1999, Rodriguez sold cocaine to a person who was cooperating with the government; Rodriguez made clear that Ross was the source of the drugs. The jury could also infer that Ross was fronting drugs to Rodriguez. At one point, Rodriguez wanted to return two ounces of drugs to Ross, but, as a

result of that transaction, rather than Ross then owing Rodriguez money, it was the other way around. The only explanation would be that Ross fronted the drugs. So, although Rodriguez was not around for a long period of time, the evidence was sufficient to show that he joined the conspiracy almost immediately after being released from prison.

Juan Hernandez (aka Bum) was a high-ranking MLD, belonging to the Rockwell and Potomac section. He was chief of the Beach and Paulina section from about 1986 until 1990. Then, in the late 1990s, he ran the Rockwell and Potomac section, one of the MLD street corners where drugs were sold on a daily basis.[2]

There is also evidence that Hernandez ordered crack and marijuana from Ross in 1999 in amounts that were not for personal use. The jury could infer that there was a high level of trust between the two. Ross was selling drugs to Hernandez on credit, and as Hernandez admitted in a post-arrest statement, he was fronted marijuana by another MLD member. The evidence is sufficient to link Hernandez to the conspiracy.

Gonzalez also contends there was insufficient evidence to show he was a member of the conspiracy. However, the wiretaps provide evidence that Gonzalez obtained drugs

---

[2] Some of the evidence against Hernandez comes from the testimony of Jose Aguirre, who discussed Hernandez's drug dealing from 1988 through 1990. Hernandez contends that it was error to admit the evidence, which in his view constructively amended the indictment by expanding the time period. Judge Gettleman found the evidence was intricately related to the conspiracy. We review evidentiary rulings for an abuse of discretion. *United States v. Spaeni*, 60 F.3d 313 (7th Cir. 1995). We cannot find that the evidence was improperly admitted. Aguirre's testimony contributed to the jury's understanding of the scope of the drug operation and how it was run.

directly from Ross and worked for Ross delivering drugs. He was a member of the Beach and Paulina section and sold drugs in a throw line on that corner in the mid-1990s. He then rose to something of a leadership position, overseeing the daily operation of the corner. Once again, we find the evidence sufficient to sustain the conviction.

The remainder of the appellants' arguments need little comment. They argue that there was a variance between the charges in the indictment and the proof at trial. Basically, they say that the government shifted its theory from one that involved a MLD drug organization to one centering, not on the gang, but on Ross. Given that shift, they argue that evidence about the gang was improperly admitted and unduly prejudicial, pursuant to Federal Rule of Evidence 403. The argument is without merit. Ross was obviously a central figure in the conspiracy, but the theory was and remained that it was an MLD operation. At closing, the government argued:

> And the best way to describe the agreement is to describe it as the Thomas Ross Maniac Latin Disciple drug distribution enterprise. This network began in the early 1990's, and the Maniac Latin Disciple street gang provided the loose structure within which this enterprise evolved.

> The gang provided the defendants with a network of relationships, a friendship network as well as a business network. And this network was an organized system of selling cocaine, powder cocaine, crack cocaine, and marijuana.

Cortes argues that the jury was improperly instructed in response to their request for recordings of calls identified in count 2. The court's reply was that the recordings were not admitted into evidence and were therefore not available. The jury was instructed to decide the count on the basis of the evidence admitted into the record. Cortes argues that

the instruction gave the government the benefit of evidence not admitted into the record. As to a supplemental instruction, we consider whether the instructions as a whole adequately treat the issue, whether the supplemental instruction is a correct statement of the law, and whether the court specifically answered the question. *United States v. Franco*, 874 F.2d 1136 (7th Cir. 1989). Cortes does not contend that the instruction was an incorrect statement of the law. We find that it also specifically answers the jury's question and adequately treated the issue. We see no error.

Rodriguez and Cortes also claim the court improperly denied their motion to sever their trials from the other defendants. This also is a decision we review for an abuse of discretion. *United States v. Mietus*, 237 F.3d 866 (7th Cir. 2001); *see Zafiro v. United States*, 506 U.S. 534 (1993). Cortes says his theory of the case was in direct conflict with that of his codefendant Medina. Rodriguez is concerned about the spill-over effect of the gang evidence. Neither defendant convinces us that severance was required.

We therefore AFFIRM the convictions of all nine defendants but REMAND the cases of Ross, Pittman, and Regalado for resentencing and those of Cortes, Rodriguez, and Hernandez, for further proceedings pursuant to procedure announced in *Paladino*.

A true Copy:

　　　　Teste:


　　　　　　　　　_____
　　　　　　　　　*Clerk of the United States Court of*
　　　　　　　　　*Appeals for the Seventh Circuit*